1  John P. Sheridan, WSBA No. 21473
   The Sheridan Law Firm, P.S.
2  705 Second Avenue, Suite 1200
   Seattle, WA  98104
3  Tel: 206-381-5949

4  Attorneys for Plaintiff

5

6

7

8         IN THE UNITED STATES DISTRICT COURT FOR THE
             EASTERN DISTRICT OF WASHINGTON
9

10 ALETA BUSSELMAN,

11           Plaintiff,                    Case No.: 4:18-cv-05109-SMJ

12
           vs.                            DECLARATION OF JOHN P.
13                                         SHERIDAN IN SUPPORT OF
                                           PLAINTIFF'S MOTION IN LIMINE
14 BATTELLE MEMORIAL                       TO EXCLUDE UNTIMELY
   INSTITUTE, an Ohio nonprofit            REPORT BY DOE'S OFFICE OF
15 corporation                             INSPECTOR GENERAL
16
           Defendant.                      9/28/2018
17                                         Without Oral Argument
18

19

20

21
           I, John P. Sheridan, make the following statement based on personal
22
   knowledge.
23

24

25

DECLARATION OF JOHN P.                    THE SHERIDAN LAW FIRM, P.S.
SHERIDAN RE: MOTION TO                         Attorneys at Law
EXCLUDE UNTIMELY REPORT                     Hoge Building, Suite 1200
Case No. 4:18-cv-05072-SMJ                     705 Second Avenue
                                             Seattle, WA  98104
                                        Tel: 206-381-5949  Fax: 206-447-9206

1.    On June 21, 2017, Plaintiff Aleta Busselman filed an administrative whistleblower retaliation complaint under the NDAA-ECP with the Department of Energy's Office of the Inspector General (OIG).

2.    On December 27, 2017, I wrote to OIG's Whistleblower Investigator, Sherre Copeland, to confirm "our agreement to let DOE/IG extend the time to investigate another sixty days." On February 26, 2018, I wrote Ms. Copeland again, stating, "We'll give you an extension of another thirty days from today" (*i.e.*, until March 28, 2018).

3.    As of July 2, 2018, when Ms. Busselman commenced the above-captioned de novo action in the U.S. District Court for the Eastern District of Washington, the Department of Energy had issued no final order concerning the administrative complaint, nor had OIG even issued an initial determination.

4.    **Exhibit 1** is a true and accurate copy of the U.S. Department of Energy, Office of Inspector General (OIG)'s Investigative Report to Management concerning Ms. Busselman's whistleblower retaliation complaint, which is dated July 5, 2018—precisely 100 days after the agreed extension of time had expired. This document was provided to me on such date by Thomas Cox, the OIG's Special Agent in Charge, National Programs.

DECLARATION OF JOHN P. SHERIDAN RE: MOTION TO EXCLUDE UNTIMELY REPORT
Case No. 4:18-cv-05072-SMJ

THE SHERIDAN LAW FIRM, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

5.    No written response to the report was provided by either party under 48 C.F.R. § 3.908.5.

6.    **Exhibit 2** is a true and accurate copy of the letter from Poli Marmolejos, the Director of the DOE's Office of Hearings and Appeals (OHA), which is dated July 9, 2018 and concerns Ms. Busselman's whistleblower retaliation complaint. This document was provided to me on such date by Phillip Harmonick, Attorney-Examiner for the OHA.

7.    **Exhibit 3** is a true and accurate copy of the letter from OHA Director Marmolejos dated August 3, 2018, which concerns Ms. Busselman's whistleblower retaliation complaint. This document was provided to me on such date by Mr. Harmonick, OHA's Attorney-Examiner.


I swear under penalty of perjury under the laws of the United States that the above statements are true to the best of my knowledge. Dated this 29ᵗʰ day of August 2018, in Bainbridge Island, Washington.

s/ John P. Sheridan
John P. Sheridan WSBA #21473

DECLARATION OF JOHN P.
SHERIDAN RE: MOTION TO
EXCLUDE UNTIMELY REPORT
Case No. 4:18-cv-05072-SMJ

THE SHERIDAN LAW FIRM, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
Tel: 206-381-5949  Fax: 206-447-9206

1

## <u>CERTIFICATE OF SERVICE</u>

2

I certify that on August 29, 2018, I electronically filed the above and

3

4

foregoing Declaration of John P. Sheridan In Support of Plaintiff's Motion in

5

Limine to Exclude Untimely Report by DOE's Office of the Inspector General

6

with the Clerk of the Court using the CM/ECF System.  Notice of Electronic

7

Filing was provided to the following counsel:

8

9

Mark Nelson Bartlett
Gillian Murphy

10

Arthur Simpson
DAVIS WRIGHT TREMAINE, LLP

11

1201 Third Avenue, Suite 2200

12

Seattle, Washington  98101

13

Attorneys for Defendant

14

15

 s/Mark Rose

16

Mark W. Rose, WSBA # 41916

17

18

19

20

21

22

23

24

25

PLAINTIFF'S MOTION IN LIMINE
TO EXCLUDE UNTIMELY
REPORT OF THE DOE-OIG - 1
Case No. 4:18-cv-05072-SMJ

THE SHERIDAN LAW FIRM, P.S.
Attorneys at Law
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA  98104
Tel: 206-381-5949  Fax: 206-447-9206

# EXHIBIT 1



**U.S. Department of Energy**
**Office of Inspector General**
**Office of Investigations**

# Investigative Report to Management

**17-0001-W**                                          **July 5, 2018**

This report, including any attachments and information contained therein, is the property of the Office of Inspector General (OIG) and is for OFFICIAL USE ONLY. The original and any copies of the report must be appropriately controlled and maintained. Disclosure to unauthorized persons without prior OIG written approval is strictly prohibited and may subject the disclosing party to liability. Unauthorized persons may include, but are not limited to, individuals referenced in the report, contractors, and individuals outside the Department of Energy. Public disclosure is determined by the Freedom of Information Act (Title 5 U.S.C. Section 552) and the Privacy Act (Title 5 U.S.C. Section 552a).



# U.S. Department of Energy
Office of Inspector General
Office of Investigations

July 5, 2018

MEMORANDUM FOR THE SECRETARY

*April Stephenson*

FROM:         April G. Stephenson
                  Acting Inspector General

SUBJECT:        INFORMATION: Retaliation Complaint pursuant to Title 41 United
                  States Code Section 4712. (OIG Case No. 17-0001-W)

This report serves to inform you of an investigation conducted by the U.S. Department of Energy (DOE), Office of Inspector General (OIG), Office of Investigations. The investigation concerns allegations filed by Aleta Busselman (Busselman) under Title 41 United States Code, Section 4712, "Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information." Busselman asserted that her reporting of possible waste, fraud, abuse, or mismanagement, and possible violations of law, rule, or regulation related to a Federal contract between the DOE and her employer, Battelle Memorial Institute (Battelle), operating at Pacific Northwest National Laboratory (PNNL), was a contributing factor in the reassignment of her employment. Busselman was the Assessment and Issues Management Manager until her reassignment to the Environmental Molecular Sciences Laboratory Triennial Review team, effective April 17, 2017.

In order for the complainant to prevail under Section 4712, she must establish by a preponderance of evidence that she made a protected disclosure that she reasonably believes is evidence of gross mismanagement, a gross waste of funds, an abuse of authority, a substantial and specific danger, or a violation of law, rule or regulation. The complainant must also demonstrate that the employer was aware of the protected disclosure and that the disclosure was a contributing factor in the personnel action which was taken. The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as the proximity in time between the protected disclosure and the personnel action. Assuming that the complainant meets this burden, the burden of proof shifts to the employer, which must demonstrate, by clear and convincing evidence, that it would have taken the same personnel action in the absence of the protected disclosure.

Busselman asserted that, in an email dated March 31, 2017, she disclosed information alleging that management was pressuring her and her team to change the root cause statement and was providing

---

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 1

changes to improperly edit the wording of the root cause statement within the Cause Analysis Report for Payment to a Fraudulent Subcontractor.  In response to her alleged disclosure, Busselman stated that management reassigned her.

The information gathered during the investigation suggests Busselman had established by a preponderance of the evidence that she made a protected disclosure to her supervisor on March 31, 2017 and that Battelle was aware of this disclosure when it reassigned her on April 17, 2017. Based on the information gathered during the investigation, we conclude that Busselman communicated to her supervisor her belief that an individual Battelle senior manager was attempting to intervene in the issues management process. The information gathered during the investigation demonstrates that the disclosure followed Battelle's dispute resolution procedures. In addition, circumstantial information gathered during the investigation, such as the close proximity in time between the disclosure and her reassignment, suggests her disclosure may have been a contributing factor in the personnel action by Battelle management.

Battelle management presented oral testimonial and documentary information in support of its defense that it was justified in its reassignment of Busselman to a different role within the Battelle organization with no loss of pay.

Busselman's most recent performance appraisal, which occurred before the disclosure, indicates performance shortcomings, and specifically lists quotations from fellow employees identifying weaknesses in Busselman's interactions with other groups. Email records support Battelle's assertion that Busselman was stressed and unhappy with her position, that she was interested in pursuing other opportunities, and had communicated her interest in other positions to her supervisor. Busselman also confirmed that, prior to any talk of reassignment, she requested some of her duties be given to her coworker. In addition, Busselman voluntarily relinquished her remaining duties at Battelle to a coworker in favor of focusing her attention on the reassigned position. We found that it was only after Busselman was unable to receive a specific description of the duties of the reassigned position that she became concerned about retaliation. Battelle management asserted that, despite the reassignment, Busselman would still qualify for the same bonuses and receive the same salary. Management also stated Busselman was "capped" in her career ladder in her former position as division director and would not have been qualified to move higher within her Department. Instead, she would have had to move into a different position within a different Department to advance. Battelle management confirmed that the reassigned position was informal and intended a replacement to the duties Busselman desired to be transferred to her coworker, and stated that her supervisor was continuing to work to create a more permanent position for her. In addition, a lack of retaliatory intent is also supported by several of Battelle's actions including (1) the willingness to continue funding Busselman's salary while she conducted the reassigned position in addition to her remaining duties, and (2) the willingness to continue funding Busselman until she found another position once she relinquished the Laboratory Planning and Performance Management duties.

This document is for OFFICIAL USE ONLY.  Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 2

Based on the available information gathered during the investigation, we find that Battelle has met its burden of establishing by clear and convincing evidence that it would have reassigned Busselman even if she had not made a protected disclosure.

## Procedural Requirements of Title 41 U.S.C. Section 4712

Although we found that management met its burden of establishing that it would have reassigned Busselman even if she had not made a protected disclosure, the following information is provided about the procedural requirements of Section 4712. The provisions of Section 4712 stipulate that, within 30 days after receiving this report, the Secretary shall determine whether there is sufficient basis to conclude that the contractor subjected the complainant to a prohibited reprisal and shall either issue an order denying relief or shall take one or more of the following actions: (1) order the contractor to take affirmative action to abate the reprisal; (2) order the contractor or grantee to reinstate the person to the position that the person held before the reprisal, together with compensatory damages (including back pay), employment benefits, and other terms and conditions of employment that would apply to the person in that position if the reprisal had not been taken; or (3) order the contractor pay the complainant for all costs and expenses, including attorneys' fees, that were reasonably incurred by the complainant in connection with bringing the complaint, as determined by the Secretary.

## Additional Information Regarding Complaint

On April 24, 2018, we were informed that Busselman filed a complaint regarding the same cause of action in the United States District Court for the Eastern District of Washington. At the time of Busselman's filing, the Office of Inspector General had completed the investigation and was in the process of completing this report. Consequently, we proceeded with issuing the Investigative Report to Management.

Cc:  Office of General Counsel
     Aleta Busselman
     Battelle Memorial Institute

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 3

## I.    ALLEGATION

This report involves a complaint filed by Aleta Busselman (Busselman) under Title 41 United States Code, Section 4712, "Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information," hereafter referred to as Section 4712.  Busselman asserted that her reporting of possible waste, fraud, abuse, or mismanagement, and possible violations of law, rule, or regulation related to a Federal contract between the Department of Energy (DOE) and her employer, Battelle Memorial Institute (Battelle), operating at Pacific Northwest National Laboratory (PNNL), was a contributing factor in the reassignment of her employment.  Busselman was the Assessment and Issues Management Manager until her reassignment to the Environmental Molecular Sciences Laboratory Triennial Review team, effective April 17, 2017.

## II.    POTENTIAL STATUTORY OR REGULATORY VIOLATIONS

The contract between the Department of Energy and Battelle contains a clause incorporating the provisions of Section 4712.

Section 4712 provides whistleblower retaliation protection for an employee of a DOE contractor who discloses information related to a Federal contract or grant.  Section 4712 states, in pertinent part:

(a) Prohibition of Reprisals.

(1) In general.-An employee of a contractor, subcontractor, or grantee may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

(2) Persons and bodies covered. The persons and bodies described in this paragraph are the persons and bodies as follows:

. . .

(G) A management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct.

(3) Rules of construction.-For the purposes of paragraph (1)-

(A) an employee who initiates or provides evidence of contractor, subcontractor, or grantee misconduct in any judicial or administrative proceeding relating to waste, fraud, or abuse on a Federal contract or grant shall be deemed to have made a disclosure covered by such paragraph; and

(B) a reprisal described in paragraph (1) is prohibited even if it is undertaken at the request of an executive branch official, unless the request takes the form of a non-discretionary directive and is within the authority of the executive branch official making the request.

---

This document is for OFFICIAL USE ONLY.  Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 4

(b) Investigation of Complaints.

     (1) Submission of complaint.  A person who believes that the person has been subjected to a reprisal prohibited by subsection (a) may submit a complaint to the Inspector General of the executive agency involved.  Unless the Inspector General determines that the complaint is frivolous, fails to allege a violation of the prohibition in subsection (a), or has previously been addressed in another Federal or State judicial or administrative proceeding initiated by the complainant, the Inspector General shall investigate the complaint and, upon completion of such investigation, submit a report of the findings of the investigation to the person, the contractor or grantee concerned, and the head of the agency.

     (2) Inspector General action.

(A) Determination or submission of report on findings. Except as provided under subparagraph (B), the Inspector General shall make a determination that a complaint is frivolous, fails to allege a violation of the prohibition in subsection (a), or has previously been addressed in another Federal or State judicial or administrative proceeding initiated by the complainant or submit a report under paragraph (1) within 180 days after receiving the complaint.

(B) Extension of time.  If the Inspector General is unable to complete an investigation in time to submit a report within the 180-day period specified in subparagraph (A) and the person submitting the complaint agrees to an extension of time, the Inspector General shall submit a report under paragraph (1) within such additional period of time, up to 180 days, as shall be agreed upon between the Inspector General and the person submitting the complaint.

Section 4712 also directs that the burdens of proof specified in Title 5, U.S.C. Section 1221 shall be followed in any investigation conducted by the OIG.  That section states that, in any case involving an alleged improper personnel practice, corrective action shall be considered appropriate if the employee has demonstrated that a disclosure or protected activity was a contributing factor in the personnel action that was taken. The employee may demonstrate that the disclosure or protected activity was a contributing factor in the personnel action through circumstantial evidence, such as evidence that the official taking the personnel action knew of the disclosure or protected activity; and the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action. The section also states that corrective action may not be ordered if, after a finding that a protected disclosure was a contributing factor, the employer demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure.

Section 4712 requires that, within 30 days after receiving this report, the Secretary shall determine whether there is sufficient basis to conclude that the contractor subjected the complainant to a prohibited reprisal and shall either issue an order denying relief or shall take one or more of the following actions: (1) order the contractor to take affirmative action to abate the reprisal; (2) order the contractor or grantee to reinstate the person to the position that the person held before the reprisal, together with compensatory damages (including back pay), employment benefits, and other terms and conditions of employment that would apply to the person in that position if the reprisal

---

OIG Case No.17-0001-W                                                                                           Page 5

This document is for OFFICIAL USE ONLY.  Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 5

had not been taken; or (3) order the contractor pay the complainant for all costs and expenses, including attorneys' fees, that were reasonably incurred by the complainant in connection with bringing the complaint, as determined by the Secretary.

However, on April 24, 2018, we were informed that Busselman filed a complaint regarding the same cause of action in the United States District Court for the Eastern District of Washington.

## III.    BACKGROUND

The Pacific Northwest National Laboratory (PNNL) is owned by the Department of Energy (DOE). Since 1965, the Management and Operating (M&O) contract for PNNL has been held by Battelle Memorial Institute (Battelle).

The following is a timeline of relevant events that is uncontested by the parties.

In September 1986, Busselman was hired as a "Cooperative Office Education student" by Battelle until completion of the program in 1987. Subsequently, she was promoted to the position of Quality Assurance assistant/clerk in the same year and was transitioned into a full time employee under the same title in 1989.

In 1993, Busselman was transferred to the Toxicology Department where she filled the position of Administrative Assistant until later that year when she was hired within the same department as Program Administrator. Next, she was promoted to the position of Department Administrator in 1996.

In January of 1999, Busselman was hired by Battelle under its contract to manage PNNL as a Project Management Specialist, where she worked until she was internally transferred to the Project Management Support Department as a Specialist IV – Deputy for Operations in 2004. In 2006, Busselman transferred to the Environmental Management Services office as the Compliance Support Specialist, Level V. Then, in January 2008, she received a promotion into the position of Project/Program Manager. Later that year, Busselman was hired as a Project Controls Specialist IV. In 2012, Busselman received a promotion to the "[Energy and Environment Directorate] EED" Project Controls Group Manager.

In December of 2014, Busselman was promoted to the position of Quality & Assurance Consultant, where she began working under Cindy Doyle, Manager of Assurance Systems. Then, the group was reorganized, and Busselman began working as the Assessment and Issues Management (AIM) Manager under John LaFemina in the Laboratory Planning and Performance Management (LPPM) Department in October of 2015 and was situated as a peer of Doyle. Busselman was officially reclassified/promoted to the Manager position in 2016 in further reflection of the reorganization change.

Since 2011, Busselman received performance ratings of "Achieved Expectations" or better from her managers. The final documented appraisal of her performance by LaFemina, dated October 1, 2015

---

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 6

– December 31, 2016, had an overall rating of "Achieved Expectations" for the stated goals. The narrative portion of the appraisal included the following positive statements:

> "You are viewed as a talented, hard working person who cares deeply about the Laboratory and your staff. You have a positive attitude and are willing to learn."
> …
> "You have done an outstanding job in strengthening the [Independent Oversight] IO program; making it more strategic and integrating those activities with the broader assessment program within the Laboratory and the IA program. I have received overwhelmingly positive feedback from colleagues throughout the Laboratory."
> …
> "You have done a great job taking over the role of Enforcement Coordinator and the feedback from [Pacific Northwest Site Office] PNSO is very positive."

The narrative portion of the appraisal also included quotations from fellow employees identifying weaknesses in Busselman's interactions with other groups, and listed several opportunities for growth:

> "The most consistent opportunity for improvement, identified by others and by me [LaFemina] is that you are functioning too much as an individual contributor and too infrequently as a senior leader in the laboratory that motivates change through influence."
> …
> "In spending so much time doing and focusing on building the AIM team you have fallen short on building the relationships critical to being able to influence; in particular, the performance POCs and the research COOs."
> …
> "My only caution is that we all remember that [Independent Oversight] IO is a tool of management and the intent of IO activities is to inform and catalyze improvements rather than playing audit 'gotcha.'"
> …
> "In building the AIM team over the past year, the relationships between [Laboratory Performance Systems] LPS and AIM teams have, unfortunately, suffered."
> …
> "You and Cindy need to develop a positive working relationship (without me [LaFemina] in the middle) in which you at least keep each other aware of, if not engaged in, nearly every aspect of the work in your group."

Busselman was awarded a 2.5% merit salary increase on January 1, 2016. The appraisal covering the period October 1, 2015 – December 31, 2016 occurred prior to the alleged protected disclosure on March 31, 2017.

On May 2, 2016, Busselman sent an email to LaFemina that stated her career interests and informed him that project management is her passion. She stated that her current role as the Assessment and

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 7

Issues Management Manager is "more of an 'after the fact' type of role and is truly more of a reactionary role," and stated, "For a project controls person – unexpected events are a bit unnerving." She also stated that her skills are most useful in "planning, training and helping project managers bring work into the lab."

A function of the Cause Analysis team is to conduct analyses on various incidents within the laboratory. One such incident occurred when, in November 2016, a request was made to the Battelle Procurement Director to change the bank account for a Battelle subcontractor for electronic payments. On December 16, 2016, an invoice payment was made to the bank account of the Battelle subcontractor, and on January 12, 2017, it was discovered that the payment was made to a fraudulent entity posing as the legitimate subcontractor. Battelle senior management was notified immediately. As reported in the October 1, 2017 – March 31, 2018 OIG Semiannual Report to Congress, the underlying issue was already reviewed and addressed by management and an Investigative Report to Management was issued that determined that PNNL was targeted in a spear-phishing scheme which resulted in a PNNL subcontractor's legitimate bank routing information being changed to that of a fraudulent account. This resulted in an improper payment by PNNL of $530,000 to the fraudulent account. In response to the Investigative Report to Management, the Pacific Northwest Site Office disallowed $430,167 in costs associated with the PNNL fraudulent payment to the entity posing as a PNNL subcontractor.

In January 2017, Iris Anderson, Battelle Financial Operations Manager, requested assistance in conducting a Root Cause Analysis for the payment to the fraudulent entity. As the AIM Manager, Busselman was contacted to gather her Cause Analysis team, and a Cause Analysis Charter was issued and approved on January 26, 2017. Members of the Cause Analysis team included Lead Cause Analyst, Kathy Pryor, Lead Cause Analyst-in training, Donaldo "Donny" Mendoza, and Financial Assurance and Risk Assessment employee, Stephanie Anderson. The Issue Owner was identified as Iris Anderson (Anderson).

In February 2017, Busselman and other LPPM employees received emails from Doyle with suggested improvements and critiques during an overall review of the LPPM group. The Causal Critique Process, which was one of Busselman's areas of oversight and which consists of Root Cause Analyses, was one of the processes critiqued. As a result of the critique, Busselman emailed her supervisor, LaFemina, and told him that she was stressed out, feeling humiliated and depressed, and was really struggling to be optimistic about her current situation. LaFemina's response emails expressed concern that Busselman may be "burning out," and she and LaFemina agreed to meet to "determine what is best for the lab."

The Battelle investigation into the improper payment to the fraudulent entity was conducted and the AIM Team finalized the draft Cause Analysis report in March 2017. The language of the root cause statement was:

> "Business Systems Directorate (BSD) management did not clearly define adequate controls regarding the identification, detection and response to potential fraudulent activities by

This document is for OFFICIAL USE ONLY.  Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 8

external criminal entities in the Vendor Management Process; primarily relying on individual staff members to identify and respond to potential external threats."

As is normal procedure, Pryor circulated the finalized draft to Steven "Steve" Cooke, Assistant General Counsel and Certified Cause Analyst, for revision. Cooke questioned the DOE expectations of prevention of external fraud and provided editorial comments, but otherwise approved the document for submission to the Issue owner for factual accuracy review.

Upon circulation for factual accuracy review, Busselman and her team learned Battelle management was dissatisfied with the root cause statement as written. The Issue Owner, Anderson, requested changes to the wording of the root cause statement from the Lead Cause Analyst, Pryor. As is the normal protocol when the lead cause analyst is unable to reach agreement with the Issue Owner, Pryor elevated the matter to her supervisor, Busselman, who discussed the conflict with Anderson.

On March 28, 2017, Martin "Marty" Conger, Battelle Chief Financial Officer, contacted Busselman to discuss his concerns over the root cause statement, suggesting that the statement included misleading conclusions. Busselman and Conger met to discuss his opposition of the root cause statement and were unable to agree. In addition, Conger spoke with Cooke about his concerns with the root cause statement. Conger and Cooke agreed and attempted to reword the root cause statement and provided suggested revisions to Pryor.

On March 30, 2017, Busselman met with LaFemina to discuss her 2017 goals. She and LaFemina discussed her struggles with the Core Business Process Steward (CBP) role and inability to work well with Doyle. In addition, Busselman discussed improvement of processes within her group. Specifically, she requested some of her Independent Oversight (IO) Duties, which were being led by Battelle employee Nancy Sargent, be transferred to Doyle since Sargent and Doyle had a better relationship and were limiting Busselman's access. Additionally, LaFemina and Busselman discussed Busselman's interests in project management and business capture, and she informed LaFemina she would like to explore those options as a career in the future.

On March 30, 2017, Busselman emailed Cooke to request he "cease and desist" communication about the root cause statement with her team. She stated she would work the issue through her dispute authority process.

In March 31, 2017, Busselman wrote LaFemina and opposed management's efforts to "pressure" her staff into changing the root cause language in a manner she believed was inconsistent with the issues management process. Her email stated:

> "Per our [How Do I?] HDI requirements and cause analyst qualification process, this is not how we do cause analysis at our lab. We do not just let concerned stakeholders manipulate root causes at the end of the process to make us sound better."
> …

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 9

> "That (changing root causes and results at the 11th hour) was the [Quality and Assurance Associate Lab Director Bryan] Mohler-way. Not doing it and I am not going to have this cause analysis team think we have returned to the "old" way of doing business."
>
> ...
>
> "I am not going to make this team sign a product they can't stand behind."
>
> ...
>
> "My recommendation: [Conger] should take the facts and data collected to date and conduct an independent cause analysis with someone that he feels is qualified to conduct his root cause analysis."

In his response later that day, LaFemina stated:

> "I understand your concerns and agree that we are not going backwards. I just spoke to Marty [Conger] and let him know that I am reviewing the report and that after spring break I will bring us together to discuss our path forward."

On April 11, 2017, LaFemina scheduled a meeting with Busselman. In the meeting he discussed an opportunity for her to work on the Environmental Molecular Sciences Laboratory (EMSL) Triennial Review wherein Busselman might gain experience with business capture assignments. In addition, LaFemina discussed an LPPM reorganization which would fulfill Busselman's request to return IO duties to Doyle and address budget issues within Battelle. Specifically, Busselman would no longer be a manager and her AIM team would be recombined into the LPS Division under Doyle's leadership, effective April 24, 2014. In addition, LaFemina proposed Busselman would remain at her current salary and continue her position as the Issues Management Lead and Battelle Coordinator for the Office of Enforcement, in addition to the EMSL duties. Busselman was upset and requested time to consider.

On April 12, 2017, Busselman was included on several emails between LaFemina and Pryor to alter the wording of the root cause statement.

Busselman's transition to work on the EMSL Triennial was effective April 17, 2017 with no loss of pay. In her new duties, Busselman no longer worked within the root Cause Analysis team.

On May 1, 2017, the final April 2017 Cause Analysis Report was issued with the following reworded root cause statement. It was approved by the authors, Pryor, Stephanie Anderson, and Mendoza, and the Issue Owner, Anderson, with what Busselman believed was inappropriate management involvement:

> "BSD Management had a primary focus on controls over internal fraud risks in response to DOE's annual risk statements in the Accounts Payable area (which did not specifically address external fraud risks), and based on the majority of previous experience involving internal fraud. Consequently, the controls for the identification, detection, and response to evolving fraudulent activities by external criminal entities in the Vendor Management Process were less than adequate."

---

OIG Case No.17-0001-W                                                              Page 10

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 10

## IV.    INVESTIGATIVE FINDINGS

**Busselman's Assertion that She Made a Protected Disclosure**

Busselman asserts that, in her email to her supervisor on March 31, 2017, she disclosed information alleging management, specifically Marty Conger, was pressuring her and her team to change the root cause statement and was providing changes to improperly edit the wording of the root cause statement within the Cause Analysis Report for Payment to a Fraudulent Subcontractor.

As noted in the Background above, Busselman stated that her team conducted an in depth, "level 2," investigation into the information for the improper payment. The team provided the draft document to Cooke for revisions throughout the process, as is typical protocol. Cooke provided editorial comments and approved the document, although he questioned the DOE expectations of prevention of external fraud and disliked the suggestion of "less than adequate controls." The team incorporated his editorial comments and circulated it for "factual accuracy review."

Busselman cited the guidelines she set up for the processing of Cause Analysis Reports. Busselman provided a copy of the "Issues Management Process" that stated the following:

> "In cases where the Issue Owner does not agree with the results of the analysis, the Laboratory Senior Cause Analyst will work with the Lead Cause Analyst, line management, the Lab-level Issue Team, and other independent technical experts as necessary to resolve the issue(s). If the issue(s) cannot be resolved, the cause analysis team's results will remain the final documented root cause analysis and the lack of consensus will be documented in the Issue Tracking System (ITS)."

Busselman stated the information is typically processed, and once the team reaches a conclusion, the only changes that should be allowed to be made by the Issue Owner are those related to factual accuracy. Furthermore, she stated that the Lead Cause analyst, in this case Pryor, is the only one authorized to make or approve changes.

Busselman stated that the Issue Owner, Anderson, did not agree with some of the facts of the case or with the root cause statement as written. As is the normal protocol when the Lead Cause Analyst is unable to reach agreement with the Issue Owner, Pryor elevated the matter to her supervisor, Busselman, who discussed the conflict with Anderson. Busselman, Pryor, and Anderson met on the issue and adjusted the report to correspond with the facts Anderson could support with documentation. However, Busselman disagreed with Anderson's request to change the root cause statement because the fact alterations did not warrant a change to the root cause statement. Busselman alleged that Anderson was "not happy with us [her team]."

Busselman stated that, on March 28, 2017, Conger, Anderson's supervisor, came to her office to discuss the report and provided a copy of the "Contract 1830 Work Statement, C-3 Performance Expectations, Objectives and Measures," with a handwritten note that stated, "We need to talk about this and how this impacts the cause analysis." The document listed the internal or management

---

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

## EXHIBIT 1 - PAGE 11

control clauses that were found in the Battelle contract. After determining that Conger had not read the report, she directed him to review it and to chat with her about the facts after he had a chance to do so.

Busselman told us that, shortly thereafter, Conger set up a meeting with Busselman to discuss the report. In attendance at the meeting was Kevin Ensign, the Associate Laboratory Director for Independent Audit. Busselman stated the conversation was "very terse." She stated that Conger was concerned about the root cause statement, suggested the root cause statement could not be finalized as worded, and requested her team to change the root cause statement. She also stated that Conger informed her that Ensign "works with him on [independent audit] reports." Busselman informed him that she would not change the report unless she received a good reason to change the report, citing the qualifications of her team who performed the report.

Busselman informed us that Cooke was also contacted by Conger to discuss the report. After the meeting, Cooke stated that he agreed with Conger's logic and was convinced to assist in changing the root cause statement, and that Conger and Cooke began suggesting changes to the report and providing them to Pryor for approval. After receiving several emails from Cooke and Conger to adjust the root cause statement, Busselman requested Cooke "cease and desist" from changing the root cause statement on March 30, 2017. In this case, Busselman disagreed with management's interference in the change of the root cause statement and stated that she believed the reason for changing the root cause involved the determination about whether the fraudulent payment would be allowable or unallowable.

In our interview with Cooke, he referenced a previous Cause Analysis report Busselman conducted in which select managers requested a change of a "willful misconduct" root cause. In this case, Busselman's management supported the willful misconduct root cause because the data supported the findings, and the cause statement was not changed. Cooke stated the willful misconduct Cause Analysis report was Busselman's first experience in dealing with unhappy management. Our interview with Busselman confirmed that the previous Cause Analysis involved a "tough discussion" wherein she had to stand her ground against an EMSL director and support her team's root cause, and management had rallied behind her and supported her decision.

On March 31, 2017, Busselman escalated the issue to her supervisor, LaFemina, as is proper protocol when there is a dispute. She provided him a copy of the draft report in dispute. She also sent him an email wherein she stated that she felt the organization was going backwards to before the time in which policies and procedures were implemented to prevent management tampering with the Cause Analysis results. Busselman cited an instance in which the previous Quality and Assurance Associate Lab Director, Bryan Mohler, retired amidst controversy. Specifically, she stated, "On information and belief," Mohler "retired because upper management investigated and learned that he had been changing the language of Root Cause Analysis results and other subsequent deliverable results."

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 12

**Busselman's Allegation that She was Reprised Against for Whistleblowing**

Busselman asserted that, in response to her protected disclosure to Battelle management of what she alleged was improper interference by Battelle management regarding the wording of the root cause statement within the Cause Analysis Report for Payment to a Fraudulent Subcontractor, Battelle took retaliatory actions against her in the form of reassignment of her employment on April 17, 2017.

On April 11, 2017, LaFemina orally informed Busselman that he decided to reorganize LPPM to address budget issues within Battelle, which would fulfill Busselman's request to return IO duties to Doyle. LaFemina informed Busselman that she would no longer be a manager and that her AIM team would be recombined into the "LPS Division" under Doyle's supervision, effective April 24, 2017. LaFemina also informed Busselman that there was an opportunity for her to work on the EMSL Triennial Review with Michael Spradling wherein Busselman might gain experience with business capture assignments. Spradling is a proposal manager who was assigned to lead the EMSL Triennial Review for that year. In addition, LaFemina informed her that she would remain at her current salary and continue her position as the Issues Management Lead that she would still be in charge of the Root Cause Analysis process, and would remain as Battelle Coordinator for the Office of Enforcement, in addition to performing her new duties within the EMSL Triennial Review. Busselman informed us that LaFemina told her that Mike Spradling really wanted LaFemina's assistance on the project, and LaFemina informed him that he had a great person (Busselman) who could help him. Busselman stated that she was told the new position was a "really urgent, important laboratory assignment."

Emails from LaFemina to Busselman following the April 11, 2017 discussion suggest Busselman was upset and requested time to consider LaFemina's proposal. Busselman told us that she was in shock following the news that she and her team would be reorganized under Doyle's leadership but believed she "didn't have a choice" about accepting the EMSL Triennial Review assignment because she was personally unable to work for Doyle due to a hostile work environment, and she "didn't have a job." Busselman stated that she later sent a "note" to her mentor, Tammy Taylor, about the change, stating that she "just got fired basically" and asking "what do I do?" Busselman then went to speak to her mentor in person, to whom she stated that she wanted to demand her job back. Busselman stated that Taylor counseled her otherwise and informed her that she would help Busselman find a place to work.

Following the April 11th meeting, LaFemina emailed Busselman and apologized that the conversation was such a surprise. He stated that he appreciated her need for time to consider the path forward and that he would like to talk with her when she returned to discuss the transition and her interest in supporting the EMSL Triennial Review. LaFemina included a draft note that he proposed sending to her AIM team and stated that he had made some assumptions about her continued leadership in key areas and hoped that she would consider them. The document that was attached detailed a recombination of the AIM team into the "LPS Division under Doyle's

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 13

leadership," and stated that Busselman would continue as the Issues Management lead and Battelle Coordinator for the Office of Enforcement, and would be taking on a business capture and proposal development role within the team working on the EMSL Triennial Review.

Busselman responded to LaFemina, and the two discussed LaFemina's proposed organizational changes via email between April 12-13, 2017. Busselman inquired whether she would report to LaFemina or to Doyle. She stated that she was not comfortable with Doyle being her manager. Further, Busselman wanted information on whether her salary would remain the same and apologized for being a disappointment. LaFemina's response informed her she was not and had never been a disappointment, but that there was "a significant mismatch between her talents and skills and what was needed to be successful in the position." He informed her that his intent was to try to get Busselman into a position that better suited her skills and desired career path, and inquired about whether she was interested in continuing as the AIM Lead or Enforcement Coordinator since she would be reporting to Doyle in those roles, but that, in the suggested EMSL role, she would report to him. He stated that her salary would be unaffected. In response, Busselman thanked LaFemina for his honesty and stated her "analytical brain spun past reason" when he explained things to her in their meeting. Busselman rejected reporting to Doyle, thus declining to remain in the Issues Management Lead and Enforcement Coordinator positions. Busselman expressed interest in the new position and agreed that it was an exciting opportunity. She stated that she would like to talk with him that afternoon and was comfortable with his proposal. Busselman provided the information to Taylor and thanked Taylor for talking her down from her "other path." Within the final email with Taylor, Busselman stated she was "getting pretty excited," indicating that she was more positive about the reassignment.

Following the email exchanges, Busselman stated she was willing to make the EMSL Triennial assignment "work." Busselman told us that she then met with LaFemina to discuss the transition, and said that he told her he would get her "hooked up" with Spradling on the following day. Busselman also told us LaFemina said that the transition information was "leaking out," and he needed her to tell her team that afternoon, and that he had already made the appointment. Busselman said she told LaFemina that she could not do it and did not know what to say to her team, and then stated that LaFemina told her exactly what to say to her team and she followed his instructions. Busselman told us that, following her message to the team, LaFemina had a discussion about the benefits of the change to the organization, and then left Busselman with her team to discuss the transition. She stated that she then told her team that she could not discuss the transition at that time, left the meeting, and began crying.

Concurrently, on April 12, 2017, Busselman was included on several emails between LaFemina and Pryor to alter the wording of the root cause statement. Busselman said that the fraudulent payment root cause statement was changed with assistance from LaFemina. Busselman told us that her team could not believe that they were being asked to change the report, and stated that she informed Pryor that she [Busselman] "lost my job over this so I don't know that you don't want to push it." The report was approved by the authors, Pryor, Stephanie Anderson, and Mendoza, and the Issue Owner, Anderson, on May 1, 2017.

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 14

Busselman's transition to work on the EMSL Triennial Review was effective April 17, 2017. In her new duties, Busselman no longer worked within the Root Cause Analysis team.

Busselman told us that she did not receive a formal job title or a formal "charge code" for the EMSL Triennial Review assignment, and when she asked LaFemina, he directed her to continue charging her salary to the AIM charge code number. Busselman stated that she believed continuing to charge her salary to AIM would constitute timecard fraud, so she requested the scope and information on what she needed to do from Mike Spradling, but was "given the runaround." She stated that she kept attempting to email Spradling and set up appointments with him, to no avail. In addition, she stated that she never received a formal job requisition or a "Welcome to the Team, Aleta" notice from Spradling.

Busselman told us that, when she was unable to gain the information she required from Spradling, she confided in LaFemina who told her to speak with her new coworkers for assignments. She stated that she spoke with several individuals, including Peg Jarrett, the Business Capture Manager, who gave her research assignments. Busselman told us that she used those research charge codes for her timecard billing during that time. In addition, Busselman told us that when she spoke with Jarrett, she was told that there were possibilities with resume collection and integration, but Busselman stated it did not sound very good to her. Furthermore, Busselman stated that, due to her inability to reach Spradling, she never had an opportunity to understand what the assignment was for EMSL.

Busselman asserted that, following her transition to EMSL, LaFemina questioned whether she was able to find work and told her that she needed to find work before October 1, 2017. In addition, Busselman told us that information was circulating about budget concerns and potential layoffs. Busselman told us that, on May 1, 2017, while inquiring about the details of the position with Peg Jarrett, Spradling's supervisor, Jarrett told her that the EMSL assignment was not real. Specifically, Busselman said Jarrett told her, "There really isn't anything there. They need to rework some stuff. . . but I'll give you some stuff to do." As noted in the Background, Busselman previously requested some of her duties be transferred to Doyle and informed her supervisor of her interests in business capture. During the course of the investigation, we discovered LaFemina offered the EMSL Triennial Review role to Busselman as a supplement for the unwanted duties and as an opportunity for Busselman to gain experience in business capture. LaFemina informed us the role was temporary until he could find Busselman a more permanent position.

Busselman told us that she reached out to her network of contacts within Battelle for job assignments. Eventually, Busselman received some work and began charging her hours to the assignments on which she worked.

On June 12, 2017, Busselman sent a note to the Laboratory Director to inform him that she believed she was removed from her job in retaliation for "standing up for Laboratory approved processes and for [her] team so that management would not improperly change root cause findings." In the email,

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 15

Busselman requested that her position and authorities be reinstated, and that her team be protected from "future improper pressure by management." Busselman provided a deadline of June 16, 2017, after which she stated that she planned to begin the process to fix the retaliation herself.

**Busselman's Burden of Proof**

In order to make a *prima facie* case, a complainant must establish, by a preponderance of the evidence that she made a protected disclosure, that management was aware of the disclosure, and that the protected disclosure was a contributing factor in the personnel action. The complainant may prove each of these elements by either direct or circumstantial evidence. An analysis of each of these evidentiary burdens follows.

The first element that Busselman has to meet is to establish, by a preponderance of the evidence, that she made a protected disclosure. Busselman asserted that she disclosed information to her supervisor that she reasonably believed constituted management misconduct related to changing the wording of the root cause statement within the Cause Analysis Report for Payment to a Fraudulent Subcontractor.

Busselman asserted that, within her email to her supervisor LaFemina, she communicated specific information that the Battelle CFO Conger had attempted to change the language of the root cause statement and began to exert pressure on her team to change the language of the statement. Specifically, the email stated her team could not "let concerned stakeholders manipulate root causes at the end of the process to make us sound better."

We interviewed Pryor who participated in the Cause Analysis Report for Payment to a Fraudulent Subcontractor. Pryor confirmed she and her team received requests to alter the root cause statement from Cooke in association with Conger after the draft was circulated for factual accuracy, and that the team felt pressured and "sick to our stomachs, mostly because you're dealing with the CFO." Pryor confirmed that her team often receives pressure to change information, but that this case was "out of the ordinary," and that she has "never seen a case before where there was that much back and forth." She also confirmed that Busselman elevated the issue to her supervisor after Busselman and Anderson were unable to reach agreement. However, Pryor asserted that, in the end, the report that was signed was a statement she could "stand behind." Therefore, she approved the changes to the report.

We interviewed LaFemina who received the email escalating the dispute to his attention. The supervisor confirmed Busselman raised concerns about CFO Conger's direction to change the root cause statement. LaFemina recalled that Busselman requested his assistance to determine a solution to the problem as was the normal protocol in the event of a dispute. LaFemina stated that he mediated the concerns at her request.

The Battelle Issues Management Process Procedures do not specifically state that the root cause, root cause code, or root cause statement cannot be changed. Instead, it provides recourse in the event the issue owner does not agree with the results of the analysis, and dictates a chain of command in order to "resolve the issue." The process of resolution of the issue is not identified and

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 16

is therefore open to interpretation. Moreover, the review for factual accuracy by the Issue Owner does not identify what exactly should or should not be changed, or whether the root cause can be included in the review.

Based on the available information gathered during the investigation we conclude that Busselman communicated to her supervisor her good faith belief that an individual Battelle senior manager was attempting to intervene in the issues management process in a manner she believed was inconsistent with the issues management process.

We conclude that Busselman has established, by a preponderance of the evidence, that the information she conveyed to Battelle management constituted a protected disclosure under Section 4712.

The second element that Busselman has to meet is to establish, by a preponderance of the evidence, that Battelle management was aware that she made a protected disclosure.

Battelle management does not dispute that it knew that Busselman elevated her concerns to her management chain for dispute resolution. Specifically, as depicted in the Issues Management Procedure, Busselman's avenue of recourse in the event of a dispute was to elevate the matter within her management chain; in this case to LaFemina. LaFemina was the recipient of her communication and intervened as requested to reach consensus and resolution.

Based on the available information gathered during the investigation, we conclude that Busselman has established that Battelle management had knowledge of a protected disclosure.

The third element that Busselman must meet is to establish that her protected disclosure was a contributing factor in the decision by Battelle management to reassign her employment. Although our review did not uncover any direct evidence that Busselman's protected disclosure was a contributing factor in the decision to reassign her employment, the very close temporal proximity between Busselman's email indicating opposition to requests by senior Battelle managers to change the root cause in March 2017, and the completion, on April 17, 2017, of the reassignment of Busselman's employment is sufficient evidence that her concerns were more likely than not a contributing factor in the decision to take that action.

Based on the information gathered during the investigation, we conclude that Busselman has established that her protected disclosure was a contributing factor in the decision by Battelle management to reassign her employment.

**Management's Burden of Proof**

Once the complainant has met her burden of proof, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the same personnel action absent the protected disclosure.

---

This document is for OFFICIAL USE ONLY.  Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 17

**Battelle Management's Description of Events Immediately Prior to Busselman's Reassignment**

In our interview with LaFemina, he told us that, when he began his position as manager of LPPM, Busselman was a team leader of the Assessment and Issues Management team, and reported to Doyle, the division director for lab performance systems at the time. He said, in November 2015, he decided to separate Doyle's duties into those for Performance Analysis and Reporting, which he considered long term analysis, and those for Assessment and Issues Management, which he considered analysis of urgency. LaFemina stated he gave Busselman the "opportunity" to lead the group by elevating the Assessment and Issues Management group to be equal to that to Performance Analysis and Reporting.

LaFemina stated, in March 2016, Busselman informed him that she was really struggling in her position, and that she did not like the immediacy of her duties. In addition, he said she informed him that she did not feel her duties were where her strengths lay, and wanted to talk about finding something different to do. LaFemina asserted that he and Busselman then started meeting once a month to discuss progress and determine how he could help.

As noted in the Background section of this report, in May 2016, the year before the Cause analysis issues and alleged retaliation, Busselman alerted LaFemina via email of her alternate career interests, and informed him that project management was her passion. In that email, she stated that her current role as the Assessment and Issues Management Manager is "more of an 'after the fact' type of role and is truly more of a reactionary role." She stated: "For a project controls person – unexpected events are a bit unnerving". She also stated that her skills were most useful in planning, training and helping project managers bring work into the lab."

In our interview with LaFemina, he asserted that, in his meetings, he and Busselman identified the utility of getting her a mentor, and later engaged Taylor as the mentor. LaFemina stated that, following the connection between Busselman and Taylor, Busselman was positive, and told him that the she and her mentor were working on identifying the roles that would be productive for Busselman's career.

When we asked about her performance, LaFemina stated that Busselman was struggling in her position. LaFemina stated Busselman had a hard time dealing with consensus, wanted things to be "black and white," and wanted her team and to be "the last word on things." LaFemina told us Busselman approached her position as an auditor position, wherein her group would audit an occurrence, make a determination, write a report, and have the report finalized. However, LaFemina stated her job was not an auditor position, instead her team was "supposed to be a tool of management that is used in continuous improvement." LaFemina stated Busselman struggled with working with people to complete her duties, and with reaching a consensus. As noted in the Background section of this report, LaFemina noted several opportunities for growth in Busselman's performance appraisal. Many of the recommendations surrounded her interactions with other

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 18

groups. Specifically, he stated, "My only caution is that we all remember that IO is a tool of management and the intent of IO activities is to inform and catalyze improvements rather than playing audit 'gotcha'."

LaFemina stated that, when he was called to assist with the Cause Analysis report, it was clear to him that Busselman did not try to reach a consensus. Instead LaFemina stated Busselman took the position of, "my cause analyst team says this, so that's the way it's going to be." He stated his perception was that Busselman did not try to understand the different points of view and wanted to "stubbornly support her team." He stated that, as a manager, Busselman should instead have figured out what to do when not everyone agrees.

LaFemina asserted that he had a mid-year performance review with Busselman at the end of March 2017, before her vacation and the reassignment. He stated that Busselman informed him that in working with Taylor, she identified an interest in working with projects and in business capture. In addition, he stated Busselman was considering leaving the laboratory to go back to school for a degree in business capture in order to later work in business capture. LaFemina also stated that, during the meeting, she continued to inform him that she was still struggling, and was particularly struggling with the assessment program. LaFemina informed us that Busselman told him she could not do all of her duties, and requested he take the assessment program and the "ownership of the lab level processes and procedures" and assign them to Doyle.

In our interview with LaFemina, he informed us that he told Busselman that he could return those select duties to Doyle, but that in removing half of her duties, there would not be enough scope for a division director role. He stated he informed her that if she only wanted half of her job, then he would have to think about a different role for her to encompass a full time position. Following the conversation, LaFemina stated Busselman went on her spring vacation.

In our interview with LaFemina, he told us that during Busselman's vacation, he contemplated her request. Email records show that, on April 4, 2017, LaFemina received an email notification of the EMSL Triennial Review from Spradling, and LaFemina offered help in any way required. LaFemina stated he coordinated with the current business capture employees, Peg Jarrett and Spradling, to acquire an opportunity for Busselman on the EMSL triennial review that would give her the opportunity to gain business capture experience. LaFemina stated Spradling told him he was very busy, but there would be "turnaround space" for Busselman to use to work on the EMSL assignments. LaFemina stated that he was willing to continue paying for Busselman's time while she worked on the EMSL triennial review, as he still had the budget to support her. On April 11, 2017, LaFemina informed Spradling that he would tell Busselman of the opportunity to work on the EMSL Triennial Review.

LaFemina stated he met with Busselman when she returned from vacation, and informed her that he would reassign the assessment program duties to Doyle as Busselman requested, and as a result of the lessened duties, he would remove Busselman from the Division Director role. In that capacity, Busselman would be a team lead over the remaining Issues Management and Enforcement Coordinator duties, and would report to Doyle. He also informed her of the EMSL opportunity that

---

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 19

she could work on in addition to her remaining duties. LaFemina told us Busselman became emotional and left the meeting. LaFemina stated, after a follow-up discussion with Human Resources wherein he learned Busselman may have heard nothing except his decision to remove her from the director position, he sent her a follow up email detailing the meeting and offering her a chance to meet once she had a chance to process the information.

From April 12-13, 2017, Busselman and LaFemina discussed his proposed organizational changes via email. Busselman apologized for being a disappointment and rejected reporting to Doyle, thus declining to remain in the Issues Management Lead and Enforcement Coordinator positions. LaFemina informed her she was not a disappointment, and believed there was a "significant mismatch between [her] talents and skills and what is needed to be successful in [the AIM Manager] position," and told her his intent was to "get her into a position that better suits both her skills and desired career path." Busselman expressed interest in the new position and agreed that it was an exciting opportunity.

LaFemina informed us that he told Busselman that due to her declination of continuing in the remaining Issues Management and Enforcement Coordinator duties under his management and her decision to focus full-time on business capture, he would only be able to use his budget to fund her salary through the end of the fiscal year. He stated he told her she would need to obtain another opportunity for funding before October 1, 2017. In addition, he stated he was working with Taylor to assist Busselman in finding a permanent position before the fiscal year ended, however, he received the allegation of retaliation from Busselman before the position could be acquired.

LaFemina confirmed that at the time the EMSL opportunity was offered to Busselman, it was a temporary assignment, not a formal position. He stated the EMSL triennial is a review done every three years that requires eight months of planning, wherein a proposal is written to explain why Battelle should continue managing the facility on behalf of the Department. In addition, LaFemina confirmed that Busselman's reaction to the EMSL position after her reassignment was "hot and cold." He told us that she alternated between thanking him and telling him she liked the career path, and being miserable due to her small turnaround space and inability to gain Spradling's attention. LaFemina stated he gave her guidance to help. He stated she eventually discovered a new position for herself within the National Security Organization as a project manager.

LaFemina stated that, had Busselman not been interested in the EMSL opportunity, he would have talked with her to determine what additional responsibilities she would have. Moreover, LaFemina stated he was no longer comfortable leaving her with "important responsibilities" such as accountability for the laboratory's assessment program and the laboratory's procedures, because she told him she did not want to do it.

In our interview, LaFemina informed us that Busselman informed him via email that she would be moving out of her current office and into the EMSL area because it was too hard for her to be with her old team. He stated he informed her that the EMSL space was not a formal office, only a turnaround area, therefore she could move if she wanted, but LaFemina stated he would keep her office open should she want it in the future.

---

This document is for OFFICIAL USE ONLY.  Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 20

LaFemina told us that his decision to reassign Busselman was completely driven by "the fact that we had been talking for nearly a year about the fact that she was unhappy in this position and she was struggling, and she knew she was struggling." Moreover, he stated, the mid-year review conversation wherein she told him she no longer wanted half of her duties and requested he assign them to Doyle, in addition to her interests in pursuing business capture, led him to believe he needed to "do something different."

In our interview, LaFemina stated he believed Busselman's allegations that she was removed from her position due to the Cause Analysis report were "completely untrue." He stated Busselman, during their meetings about her reassignment, never mentioned the "causal [analysis]." In addition, he stated the allegation that Busselman was pressured or asked to change the causal analysis was completely untrue. LaFemina indicated that there is a difference between the "root cause," "root cause code," and "root cause statement." He indicated the root cause and root cause codes come directly from DOE and stated that the codes never changed from those in the draft report. He also indicated, however, that the change requests from management surrounded the wording of the root cause statement, and were routine requests. In addition, he stated that the inclusion of Conger in the discussion about the Cause Analysis report was not unusual because Conger was Anderson's manager. He stated that when Anderson, as the issue owner, was unable to reach consensus she went to Conger in the same way that Busselman contacted LaFemina when she was unable to reach agreement.

LaFemina asserted that, despite the reassignment, Busselman would still qualify for the same bonuses, and receive the same salary. In addition, he stated in her former position as division director, Busselman was "capped" in her career ladder, and would not have been qualified to move higher into his position. Instead, he stated she would have had to move into a different position in a different group to advance.

In our interview with Cooke, Battelle Assistant General Counsel and the trainer/mentor for cause analysts and the Cause Analysis Reporting Process, he explained the general Cause Analysis reporting process. According to Cooke, DOE cause codes come from an "ORPS manual" (Occurrence Reporting Processing System) and are standardized, and attached to the root cause in what he terms the "gray box," which is the root cause statement. Cooke confirmed that when changes are requested in the Cause Analysis reports, it is up to the team's discretion to accept or deny those change requests. Cooke informed us that Cause Analysis reports are often opposed, and told us that each causal analyst in Battelle has been pressured or "beat up" by management when managers are unhappy with the reports. Moreover, Cooke stated no one is ever happy with the Cause Analysis reports when the results tell the issue owner their program or process is flawed.

Cooke stated it is not uncommon that changes are requested regarding the root causes; however, the Cause Analysis teams are usually less amenable to changing root causes unless the facts change enough to justify the change. Specifically, he stated, "there's an iterative process between the team and the issue owner" when conducting causal analysis, and that it is not uncommon for management to get involved for various reasons. He also stated that many individuals like to "wordsmith" the root cause statements, and it is up to the team's discretion to change them.

---

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 21

In our interview, Cooke related that he met with Conger more than once to discuss Conger's requested changes in the Cause Analysis report. Specifically, Cooke stated there was no discussion about the root causal "codes," as Conger agreed with the determination. Cooke told us Conger's opposition focused on the wording of the "root cause statement," and informed us that part of Conger's concerns with the root cause statement surrounded the allowability or unallowability of funds for the fraudulent payment. Cooke told us Conger was concerned that the financial side of DOE would misinterpret the report as it was written and would not fully understand that causal analysis reports are intended to fix problems, not to make determinations of allowability or culpability. Cooke told us that he understood Conger's point of view.

**Office of Inspector General Analysis**

Battelle management presented oral testimonial and documentary information in support of its defense that it was justified in its reassignment of Busselman to a different role within the Battelle organization.

Although the performance appraisals indicate that Busselman received positive performance ratings over a long period of time, the notes contained within the most recent performance appraisal prior to the disclosure indicate performance shortcomings, and specifically list quotations from fellow employees identifying weaknesses in Busselman's interactions with other groups. Additionally, email records support Battelle's claims that Busselman was stressed and unhappy with her position, and that she was interested in pursuing other career opportunities before the protected disclosure took place. In fact, Busselman confirmed requesting that some of her duties be given to her coworker, Doyle. We also note that in the interview with Busselman, she confirmed she had had a discussion with LaFemina regarding removal of her less desired duties and discussed switching careers immediately prior to her reassignment, though Busselman stated that she did not plan to leave so quickly.

Email records confirm Busselman's response to her removal from the division director position and subsequent reassignment was originally negative, however after the information regarding the role was relayed, she stated she was excited to pursue the opportunity. She also voluntarily relinquished the remaining LPPM duties which would have required her to report to Doyle, in favor of focusing her attention on the reassigned position. It was only after she was unable to receive a specific scope for the reassigned position that she became unhappy. LaFemina confirmed that the position was informal and was intended as a replacement to undesired duties that Busselman requested be reassigned to Doyle, and stated that he was continuing to work to create a more permanent position for her.

Our interview with Pryor and Busselman indicated that, due to the nature of salary funding at Battelle, employees whom management wish to remove are not typically "fired." Instead, individuals are typically reassigned into roles where acquisition of salary funding is difficult. However, we find that due to the nature of the original proposal to Busselman wherein she would continue duties under LaFemina's budgetary umbrella, and therefore fund her salary through LaFemina's department, Busselman was not placed in the position where she would be required to find immediate funding. Subsequently, when Busselman voluntarily relinquished the remaining

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 22

LPPM duties, LaFemina offered to fund her work until the end of the fiscal year, at which time he hoped a more permanent position would be determined. The willingness of Battelle management to continue funding Busselman's salary while she completed the EMSL work in addition to the remaining LPPM duties and the willingness to continue funding her salary until she found another position once she relinquished the LPPM duties, indicated a lack of retaliatory intent. In Busselman's case, she could have stayed in LaFemina's group with the remaining duties not assigned to Doyle and therefore remained under LaFemina's budget beyond the end of the fiscal year. Instead Busselman elected to leave her position and accepted the EMSL role full-time, despite being told her decision to no longer work for LPPM would mean she would need to seek alternative funding once she reached the end of the fiscal year.

Our interviews relayed a distinction between "root cause," "root cause code," and "root cause statement." The Battelle employees and managers we interviewed agreed that the root cause and root cause code are standardized by management. However, the root cause statement is written by the Cause Analysis team and is based on the facts of the analysis. The Issues Management Process Procedures does not specifically state that the root cause, root cause code, or root cause statement cannot be changed. Instead, it provides recourse in the event that the Issue Owner does not agree with the results of the analysis and dictates a chain of command in order to "resolve the issue." The process of resolution of the issue is open to interpretation. Moreover, the review for factual accuracy by the Issue Owner does not identify what exactly should or should not be changed or whether the root cause can be included in the review. Therefore, we are unable to support the original "disclosure" that management improperly interfered in the Cause Analysis report.

Based on our evaluation of the available information gathered during the investigation, we conclude that Battelle has demonstrated, by clear and convincing evidence, that it would have reassigned Busselman's employment in the absence of her protected disclosure.

**Conclusion**

Based on the available information gathered during the investigation, we conclude that Busselman has established by a preponderance of the evidence that information she conveyed to her management regarding the interference in the Cause Analysis Report for Payment to a Fraudulent Subcontractor by select Battelle managers, constituted a protected disclosure within the definition of Section 4712. Available information also suggests that Battelle management was aware of these disclosures, and that there is circumstantial evidence to suggest Busselman's disclosure may have been a contributing factor in the decision by Battelle management to reassign her employment on April 17, 2017. Finally, available information suggests that Battelle management has proved by clear and convincing evidence that it would have taken the personnel action absent Busselman's disclosure.

## V.    RECOMMENDATIONS

Based on the findings in this report, the OIG provides no recommendations to the Secretary regarding Busselman's allegation of reprisal.

This document is for OFFICIAL USE ONLY. Public disclosure is determined by the Freedom of Information Act (Title 5, U.S.C., Section 552) and the Privacy Act (Title 5, U.S.C., Section 552a).

EXHIBIT 1 - PAGE 23

# EXHIBIT 2

**Department of Energy**
Washington, DC 20585

July 9, 2018

By Electronic Mail

John P. Sheridan, Esq.
Sheridan Law Firm
Hoge Building, Suite 1200
705 Second Avenue
Seattle, WA 98104
jack@sheridanlawfirm.com

Gillian Murphy, Esq.
Davis Wright Tremaine, LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
gillianmurphy@dwt.com

Re:    Case No. WBR-18-0001

Dear Mr. Sheridan and Ms. Murphy:

On July 6, 2018, the Office of Hearings and Appeals (OHA) of the Department of Energy (DOE) received a report from the DOE Office of Inspector General (OIG) entitled "Whistleblower Investigation 17-0001-W Busselman v. Battelle Memorial Institute" (the Report). The OIG Report reflects the results of the OIG's investigation of a whistleblower complaint initiated by Ms. Aleta Busselman against Battelle Memorial Institute (Battelle) under the National Defense Authorization Act's Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information Act (NDAA-ECP) (codified at 41 U.S.C. § 4712).

Pursuant to the NDAA-ECP, once the agency OIG issues its report, the agency to which the report is issued has thirty (30) days to determine whether there is a sufficient basis to conclude that the contractor or grantee concerned has subjected the complainant to reprisal, and to issue an order either granting or denying relief. At DOE, OHA has been delegated responsibility for this determination.

The NDAA-ECP provides the OIG with one hundred eighty (180) days to make a determination concerning the merits of a whistleblower's complaint.    41 U.S.C. § 4712(b)(2)(B).    A whistleblower may file a *de novo* action in the appropriate U.S. district court based upon exhaustion of administrative remedies if the applicable executive agency does not issue an order within two hundred ten (210) days after the whistleblower submits the complaint or, in the case of an extension of time for the OIG to conduct its review, within thirty (30) days after the expiration of the extension of time. 41 U.S.C. § 4712(c)(2). In this case, Ms. Busselman filed her complaint on June 21, 2017, and agreed to extend the period for the OIG's review to March 27, 2018. The

EXHIBIT 2 - PAGE 1

- 2 -

OIG issued its Report more than thirty (30) days after March 27, 2018, and Ms. Busselman has filed a *de novo* action in the U.S. District Court for the Eastern District of Washington.

Pursuant to NDAA-ECP, once a complainant files a *de novo* action in U.S. district court, the "district court of the United States [] shall have jurisdiction over such an action without regard to the amount in controversy." 41 U.S.C. § 4712(c)(2). Accordingly, there is a question at issue regarding OHA's jurisdiction over this matter. Therefore, I invite the parties to submit briefs, not exceeding ten (10) pages, concerning whether OHA possesses jurisdiction over this matter. Each party shall have until 5:00 ET on Monday, July 16, 2018 to file this submission. Please include the above-referenced case number on all filings, submit filings electronically to OHA.filings@hq.doe.gov, and serve the other party with a copy of your filings.

If you have any questions regarding this letter, please contact Richard Cronin, Jr., Chief, Employee Protection and Exceptions, at Richard.Cronin@hq.doe.gov or (202) 287-1589.

Sincerely,

for
Poli A. Marmolejos
Director
Office of Hearings and Appeals

EXHIBIT 2 - PAGE 2

# EXHIBIT 3



**Department of Energy**
Washington, DC 20585

August 3, 2018

**By Electronic Mail**

Mark N. Bartlett, Esq.
Davis Right Tremaine, L.L.P.
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
markbartlett@dwt.com

John P. Sheridan, Esq.
The Sheridan Law Firm, P.S.
Hoge Building, Suite 1200
705 Second Ave.
Seattle Washington 98104
jack@sheridanlawfirm.com

Re:  Busselman NDAA-ECP Complaint

Dear Mr. Bartlett and Mr. Sheridan:

This letter concerns a July 5, 2018, report issued by the Department of Energy's Office of Inspector General (OIG) concerning a whistleblower complaint filed against Battelle Memorial Institute (Battelle), by Ms. Aleta Busselman. This complaint (Complaint) was filed pursuant to the National Defense Authorization Act's Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information Act (NDAA-ECP), 41 U.S.C. § 4712.

On July 9, 2018, we invited both parties to provide briefs addressing whether the Office of Hearings and Appeals (OHA) had jurisdiction to issue any order on the merits regarding Ms. Busselman's Complaint, given that she had already filed another complaint with the U.S. District Court pursuant to the NDAA-ECP.

We have considered the briefs submitted by both Battelle's counsel and Ms. Busselman's counsel.  As explained below, the claims in this matter are now pending within the jurisdiction of the United States District Court for the Eastern District of Washington.  As such, we decline to exercise jurisdiction under 41 U.S.C. § 4712 to issue an order regarding the merits of Ms. Busselman's Complaint.

## I.  Background

Subsection (b) of the NDAA-ECP requires the OIG to complete its investigation of a complaint and submit a report of findings within one hundred eighty (180) days, unless a complainant agrees to an extension for the OIG's investigation.  If the complainant agrees to an extension, the

OIG must complete the investigation and submit the report of findings within the time frame agreed upon between OIG and the complainant. 41 U.S.C. § 4712(b)(2)(A)–(B). Subsection (c) of the NDAA-ECP requires that, within thirty (30) days of receiving a report from the OIG pursuant to subsection (b), the head of the agency shall issue an order granting or denying relief to the complainant. 41 U.S.C. § 4712(c)(1).[1] A complainant may file a *de novo* action in the appropriate U.S. district court based upon exhaustion of administrative remedies if the agency denies relief to the complainant.  The complainant may also file a *de novo* action in U.S. district court if the agency does not issue an order within two hundred ten (210) days after the complaint was submitted, or, in the case of an extension of time for the OIG to conduct its review, within thirty (30) days after the expiration of the extension of time. 41 U.S.C. § 4712(c)(2).

Ms. Busselman agreed to extend the time period for the OIG's review of her Complaint to March 27, 2018. Because DOE did not issue an order on Ms. Busselman's Complaint within thirty (30) days of March 27, 2018, Ms. Busselman was eligible to file a *de novo* action in U.S. district court at any time after April 26, 2018 (30 days after March 27, 2018). On July 2, 2018, Ms. Busselman filed a *de novo* action in the U.S. District Court for the Eastern District of Washington.[2] The OIG ultimately submitted its report on July 5, 2018, after Ms. Busselman had filed her claim with the U.S. District Court for the Eastern District of Washington.

Pursuant to the NDAA-ECP, once a complainant files a *de novo* action in U.S. district court, the "district court of the United States [] shall have jurisdiction over such an action without regard to the amount in controversy." 41 U.S.C. § 4712(c)(2).

## II.    Analysis

The NDAA-ECP requires OHA to issue a determination concerning a complaint under NDAA-ECP "[n]ot later than 30 days after receiving an Inspector General report *pursuant to subsection (b)* . . . ." 41 U.S.C. § 4712(c)(1) [emphasis added]. An act is "pursuant to" a thing if it is "in compliance with; in accordance with." Black's Law Dictionary 1272 (8th ed. 2004). Under subsection (b), the OIG is required to either "submit a report . . . within 180 days after receiving the complaint" or, if the complainant agrees to an extension of time, "within such additional period of time . . . as shall be agreed upon between the Inspector General and the person submitting the complaint." 41 U.S.C. § 4712(b)(2)(A)–(B). The OIG did not submit its report concerning the Complaint pursuant to subsection (b) because the OIG did not act in accordance with subsection (b)'s requirement to issue a report by the extended deadline agreed to by Ms. Busselman and the OIG.  In light of this statutory language, OHA concludes that it is not compelled to issue a final order on Ms. Busselman's Complaint and, in this case, declines the invitation to issue a decision on a matter that is now pending in federal district court.

---

[1] The Office of Hearings and Appeals is the quasi-judicial arm of DOE that issues Departmental decisions with respect to any adjudicative proceeding which the Secretary may delegate, including whistleblower complaints filed with the agency.  See DOE Delegation Order No. 00-002.16.  Pursuant to the delegation of authority, OHA has been designated to act as the "head of the agency" for purposes of issuing any order pursuant to the NDAA-ECP.

[2] Ms. Busselman prematurely filed a complaint with the U.S. District Court for the Eastern District of Washington on April 24, 2018. Ms. Busselman subsequently refiled the complaint on July 2, 2018.

EXHIBIT 3 - PAGE 2

Our determination not to issue an order on the Complaint is further supported by judicial holdings regarding kick-out provisions in whistleblower statutes that are similar to that in the NDAA-ECP. The Sarbanes-Oxley Act of 2002 contains a whistleblower provision with language parallel to that of the NDAA-ECP. That provision allows complainants to file *de novo* claims in federal court based on exhaustion of administrative remedies if the U.S. Department of Labor (DOL) does not issue a final decision on the complaint within the statutory deadline. *Compare* 41 U.S.C. § 4712(c)(2) *with* 18 U.S.C. § 1514A(b)(1)(B); *see also Moore v. Univ. of Kan.*, 118 F.Supp.3d 1242, 1253 (D. Kan. 2015) (observing "[t]he relevant parallel language between § 4712 and whistleblower provision of Sarbanes–Oxley . . . ."). Once the statutory deadline for review of a complaint has elapsed, a complainant under Sarbanes-Oxley is not required to participate in further administrative appeals even if DOL makes them available. *Hanna v. WCI Cmtys.*, 348 F.Supp.2d 1322 (S.D. Fla. 2004).

DOL's Administrative Review Board has repeatedly dismissed complaints under Sarbanes-Oxley for lack of subject matter jurisdiction once the statutory deadline for agency action has run and a complainant files a *de novo* claim in U.S. district court on the basis of exhaustion of administrative remedies. *E.g.*, *Kelly v. Sonic Auto*, ARB No. 08-027, 2008 DOL. Ad. Rev. Bd. Lexis 160 (DOL Ad. Rev. Bd. 2008); *see also Candler v. URS Corp.*, ARB No. 13-045, 2013 DOL Ad. Rev. Bd. Lexis 61 (DOL Ad. Rev. Bd. 2013). Furthermore, even if DOL found subject matter jurisdiction and issued a decision, it would be "a nullity because it was entered after jurisdiction had vested in the district court." *Stone v. Duke Energy Corp.*, 432 F.3d 320, 322 (4th Cir. 2005). The parties have identified no compelling rationale for departing from the sound practice of DOL under Sarbanes-Oxley, and we decline to do so here.[3]

For these reasons, OHA declines to issue an order addressing the complainant's claims in these circumstances where the complainant has exhausted her administrative remedy under the involved statute, and is pursuing a *de novo* action involving the same claims in federal district court.

If you have any questions regarding this matter, please contact Neil Schuldenfrei, Deputy Director, Office of Hearings and Appeals, at (202) 287-1887, or by email at neil.schuldenfrei@hq.doe.gov.

Sincerely,

Poli A. Marmolejos
Director
Office of Hearings and Appeals

---

[3] Battelle argues in its brief that Congress' intent for OHA to issue a final order is demonstrated by a unique provision of the NDAA-ECP, which provides the complainant a right to introduce an order by OHA as evidence in the *de novo* action. Specifically, NDAA-ECP provides that "[a]n Inspector General determination and an agency head order denying relief under paragraph (2) shall be admissible in evidence in any de novo action at law or equity brought pursuant to this subsection." 41 U.S.C. § 4712(c)(3). We do not agree with Battelle's reading of this provision. This provision allows for the admissibility in federal district court of any order issued by the head of an agency; however, it does not compel the issuance of such an order.

EXHIBIT 3 - PAGE 3