FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Oct 10, 2018

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALETA BUSSELMAN,<br><br>                  Plaintiff,<br><br>v.<br><br>BATTELLE MEMORIAL INSTITUTE, an Ohio nonprofit corporation,<br><br>                  Defendant. | No. 4:18-CV-05109-SMJ<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND DENYING DEFENDANT'S MOTION TO DISMISS** |

Before the Court, without oral argument, is Defendant Battelle Memorial Institute's Motion to Dismiss for Failure to State a Claim, ECF No. 8, and Plaintiff Aleta Busselman's related Request for Judicial Notice, ECF No. 10.

Defendant asks the Court to dismiss Plaintiff's complaint, which alleges whistleblower retaliation under the National Defense Authorization Act, 41 U.S.C. § 4712 ("NDAA"). Defendant argues Plaintiff did not make a disclosure protected by the NDAA. Construing the complaint in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court disagrees with Defendant. Specifically, the Court concludes the complaint states a facially plausible claim that Defendant retaliated against Plaintiff for disclosing information she reasonably

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND DENYING DEFENDANT'S MOTION TO DISMISS **-** 1

believed evidenced Defendant's gross mismanagement of, or abuse of authority relating to, its contract with the U.S. Department of Energy, as well as Defendant's violation of regulations governing that contract. Accordingly, the Court denies Defendant's motion to dismiss.

In deciding Defendant's motion to dismiss, Plaintiff asks the Court to take judicial notice of six documents. The Court denies Plaintiff's request as to the third, fourth, and fifth documents because Defendant disputes whether they apply. The Court grants Plaintiff's request as to the first, second, and sixth documents because the complaint necessarily relies on them, they are posted on the energy department's official website, and Defendant does not contest their authenticity. Accordingly, the Court grants in part and denies in part Plaintiff's request for judicial notice.

## BACKGROUND

Defendant is an energy department contractor that manages the Pacific Northwest National Laboratory in Richland, Washington. ECF No. 1 at 1–2. Plaintiff is Defendant's employee at this location and has worked there for over 30 years. *Id.* at 2–3. Plaintiff eventually became Defendant's Enforcement Coordinator. *Id.* at 4, 8. In that role, Plaintiff served as Defendant's single point of contact for enforcement coordination and reporting into the energy department's Noncompliance Tracking System, which all contract laboratories use for notifying the energy department of events exceeding noncompliance risk limits. *Id.* at 4. Such reports communicate a

contractor's compliance assurance processes so the energy department may decide whether to exercise regulatory discretion, mitigate possible sanctions, or both. *Id.* at 4–5. Plaintiff also interfaced and integrated Laboratory Issues Management processes with key staff in the Incidents of Security Concerns Program. *Id.* at 5. Plaintiff performed this function for concerns that needed to be reported in the energy department's Safeguards and Security Information Management System. *Id.*

As Enforcement Coordinator, Plaintiff had a team of eight people who reported to her directly and were responsible for various aspects of independent oversight, assessment, and issues management. *Id.* The team's focus was to investigate issues of medium or high significance. *Id.* at 5–6. The team would work with an appropriate manager to critique an issue by documenting surrounding facts, determine the issue's root cause through specialized technical analysis, create a formal corrective action plan, and conduct a formal effectiveness evaluation to determine whether the corrective actions fixed the underlying root and contributing causes. *Id.* at 6.

When Plaintiff began her job, she interviewed her individual team members and observed their work. *Id.* She learned her team was reluctant to participate in controversial root cause analyses because management exerted pressure to change the results of the team's final conclusions. *Id.* While management is not qualified to make substantive changes to an identified root or contributing cause, Plaintiff

learned that management had previously ordered or supported such changes in varying circumstances. *Id.* In 2015, the Quality and Assurance Associate Laboratory Director retired because upper management investigated and learned he had been changing the language of root cause analysis results and other subsequent deliverable results, i.e., corrective action plans. *Id.* at 7–8. It was known by those conducting these analyses that such changes were prohibited to preserve the independent analysis of the qualified team chartered to discover the root cause of an issue. *Id.* at 7. This was known even in the absence of a formal written policy preventing management from making such changes. *Id.*

Plaintiff developed such an internal policy in October 2016. *Id.* at 10. The policy reads,

> In cases where the Issue Owner does not agree with the results of the [root cause] analysis, the Laboratory Senior Cause Analyst will work with the Lead Cause Analyst, line management, the Lab-level Issue Team, and other independent technical experts as necessary, to resolve the issue(s). If the issue(s) cannot be resolved, the cause analysis team's results will remain the final documented root cause analysis, and the lack of consensus will be documented in the Issue Tracking System . . . .

*Id.* (alteration in original).

In December 2016, Defendant authorized payment of a $530,000 invoice submitted by a fraudulent entity posing as a subcontractor. *Id.* at 10–11. The U.S. Department of the Treasury electronically transferred the funds to the fraudulent

entity. *Id.* at 11. Defendant became aware of the fraud in January 2017. *Id.* Schemes like this had been an ongoing issue for Defendant since 2015. *Id.* at 13. Defendant had notice of such efforts to defraud since early 2016. *Id.*

Defendant's contract with the energy department requires it to comply with various federal policies and guidelines for combating fraud. *Id.* at 12. Specifically, management must develop internal policies and procedures to combat fraud and ensure they are properly implemented and effective. *Id.* at 13.

Defendant requested Plaintiff's assistance to determine the root cause of its $530,000 payment to a fraudulent entity. *Id.* Under Plaintiff's supervision, a cause analysis team was assigned. *Id.* at 13–14. The issue was determined to be of medium significance, requiring a level 2 root cause analysis. *Id.* at 14. The scope of the cause analysis was limited to Defendant's response to the fraudulent entity's prompt. *Id.* Other governmental agencies launched investigations into how the fraudulent entity obtained the information necessary to accomplish this deception. *Id.*

After reviewing over twenty-five documents and interviewing nineteen witnesses, Plaintiff's team determined the root cause of Defendant's $530,000 payment to a fraudulent entity was management's failure to clearly define adequate controls. *Id.* at 14–15. Specifically, in March 2017, Plaintiff's team found

> Business Systems Directorate . . . management did not clearly define adequate controls regarding the identification, detection and response to potential fraudulent activities by external criminal entities in the

Vendor Management Process; primarily relying on individual staff members to identify and respond to potential external threats.

*Id.* at 15. Plaintiff's team also identified relevant facts surrounding the fraud, finding,

> 2.38.1 There is no segregation of duties between the Contracts Vendor Coordinator and the Accounts Payable Vendor Coordinator; the same person currently fills both roles.
> 2.38.2 Transition of key staff out of both the AP and Contracts organizations resulted in some staff assuming additional responsibilities while maintaining their normal work load.
> 2.38.3 In the Accounts Payable and Contracts organizations, some staff indicated they felt that the work load was impacting the completeness and accuracy of their work.
> 2.38.4 The current Accounts Payable Manager has been in the role for approximately 1.5 years; this manager is less familiar with the identities of the vendors/POCs.
> 2.38.5 [Defendant] relies on individual staff members to identify and respond to potential fraudulent activity by external sources; however, this is not a written expectation.
> 2.38.6 The training was informal and included 'tribal knowledge' of processes and expectations; it did not include the personal best practice of confirming changes with the listed vendor POCs.

*Id.* at 15–16.

Plaintiff learned management was dissatisfied with her team's root cause finding and sought to change it. *Id.* at 17. Plaintiff opposed any change to the language above. *Id.* Around March 29, 2017, Defendant's Chief Financial Officer and Associate Laboratory Director for Business Systems became concerned over the root cause finding and began to exert pressure to change it because he felt it made management look bad. *Id.* at 19. He told Plaintiff that the way the root cause finding

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND DENYING DEFENDANT'S MOTION TO DISMISS - 6

was written did not put the laboratory in a good light and made it look as if it were asleep at the wheel. *Id.* In the ensuing days, Plaintiff attended several meetings and exchanged numerous emails with management seeking to protect her team from pressure to change the root cause finding. *Id.*

On March 31, 2017, Plaintiff wrote to Defendant's Associate Laboratory Director, stating,

> Per our HDI requirements and cause analyst qualification process, this is not how we do cause analysis at our Lab. We do not just let concerned stakeholders manipulate root causes at the end of the process to make us sound better. Steve Cooke looked at this report twice before it came to [management]. [Management] has yet to bring the team together to discuss how they got to the end results. That (changing root causes and results at the 11th hour) was the [prior Quality and Assurance Associate Laboratory Director's ]way. Not doing it and I am not going to have this cause analysis team think that we have returned to the 'old' way of doing business. Otherwise, why bother.
> . . . .
> I am not going to make this team sign a product they can't stand behind.

*Id.* at 19–20.

Plaintiff's efforts were ultimately unsuccessful. *Id.* at 17–18. Defendant's final April 2017 Cause Analysis Report changed the language as follows:

> Business Systems Directorate management had a primary focus on controls over internal fraud risks in response to [the energy department]'s annual risk statements in the Accounts Payable area (which did not specifically address external fraud risks) and based on the majority of previous experience involving internal fraud. Consequently, the controls for the identification, detection and response to evolving fraudulent activities by external criminal entities in the Vendor Management Process were less than adequate.

*Id.* at 17. Additionally, Defendant's final report deleted many of the relevant facts surrounding the fraud. *Id.* at 18.

Management's actions in changing the root cause finding violated internal policy. *Id.* Management lacked training and expertise to make these changes. *Id.* at 17. Further, it was a conflict of interests for management to makes these changes because the root cause finding blamed management's failure to clearly define adequate controls. *Id.* at 17–18.

Defendant soon retaliated against Plaintiff. *Id.* at 17, 20–24. After exhausting administrative remedies, Plaintiff filed this lawsuit against Defendant on July 2, 2018. *Id.* at 2–3. Defendant moves to dismiss the complaint for failure to state a claim upon which relief can be granted. ECF No. 8. As part of her response, Plaintiff requests judicial notice of documents relating to her claim. ECF No. 10.

## LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure 12(b)(6), the Court must dismiss the complaint if it "fail[s] to state a claim upon which relief can be granted."

In deciding a Rule 12(b)(6) motion, the Court construes the complaint in the light most favorable to the plaintiff and draws all reasonable inferences in the

plaintiff's favor. *Ass'n for L.A. Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011). Thus, the Court must accept as true all factual allegations contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court may disregard legal conclusions couched as factual allegations. *See id.*

To survive a Rule 12(b)(6) motion, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists where the complaint pleads facts permitting a reasonable inference that the defendant is liable to the plaintiff for the misconduct alleged. *Id.* Plausibility does not require probability but demands more than a mere possibility of liability. *Id.* While the complaint need not contain detailed factual allegations, threadbare recitals of a cause of action's elements, supported only by conclusory statements, do not suffice. *Id.* Whether the complaint states a facially plausible claim for relief is a context-specific inquiry requiring the Court to draw from its judicial experience and common sense. *Id.* at 679.

## DISCUSSION

**1. The Court takes judicial notice of appendixes 1, 2, and 6 in ECF No. 10-1 and rejects the other documents provided.**

"The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Taking judicial

notice does not convert a Rule 12(b)(6) motion into a summary judgment motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

Although the Court generally may not consider material beyond the pleadings in deciding a Rule 12(b)(6) motion, the Court "may consider extrinsic evidence not attached to the complaint if the document's authenticity is not contested and the plaintiff's complaint necessarily relies on it." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015) (considering a deed of trust in ruling on a Rule 12(b)(6) motion because the parties did not dispute the deed's authenticity and the plaintiff's complaint necessarily relied upon the deed as the source of the defendant's alleged duty).

Additionally, the Court "may take judicial notice of some public records, including the records and reports of administrative bodies." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1001 (9th Cir. 2018). Thus, the Court "may take judicial notice of 'official information posted on a governmental website, the accuracy of which [is] undisputed.'" *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015) (alteration in original) (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011)).

Plaintiff asks the Court to take judicial notice of six documents. Defendant disputes whether the third, fourth, and fifth documents apply. Therefore, the Court may not take judicial notice of those documents—various energy department

orders. Defendant argues the first, second, and sixth documents are irrelevant. The Court disagrees. The complaint cites and necessarily relies on those documents—two modifications to Defendant's contract and one energy department handbook outlining Plaintiff's job. Further, those documents are posted on the energy department's official website and Defendant does not contest their authenticity. Therefore, the Court must take judicial notice of those documents. The Court turns now to the substance of those documents.

By regulation, an energy department contractor "shall be responsible for maintaining, as an integral part of its organization, effective systems of management controls." 48 C.F.R. § 970.5203-1(a)(1). These controls must "reasonably ensure that . . . financial, statistical, and other reports necessary to maintain accountability and managerial control are accurate, reliable, and timely." *Id.* Further, these controls "shall be documented and satisfactory to [the energy department]." § 970.5203-1(a)(2). Also, an energy department contractor "shall be responsible for maintaining, as a part of its operational responsibilities, a baseline quality assurance program that implements documented . . . control and assessment techniques. § 970.5203-1(b).

Defendant's contract contains identical provisions as the regulation quoted above. ECF No. 10-1 at 6–7, 14–15. Additionally, the contract provides Defendant "shall develop a Contractor assurance system that is . . . implemented throughout

the Contractor's organization." *Id.* at 4, 12. This system, "at a minimum, shall include the following key attributes," as relevant here. *Id.* at 5, 12. First, this system must include "[a] comprehensive description of the assurance system with processes, key activities, and accountabilities clearly identified." *Id.* Second, this system must include "[r]igorous, risk-based, credible self-assessments, . . . including . . . independent reviews." *Id.* Finally, this system must include "[i]dentification and correction of negative . . . compliance trends." *Id.*

According to an energy department handbook, an Enforcement Coordinator's responsibilities include "[e]nsuring that contractor managers have a working knowledge of [the energy department]'s enforcement program," "[m]onitoring contractor compliance assurance program effectiveness and progress in moving toward a culture of critical self-evaluation and continuous improvement," "[m]anaging or overseeing screening of problems, issues, findings, and conditions to identify noncompliances," and, critically "[e]nsuring proper and timely reporting of noncompliances." *Id.* at 106.

'Noncompliance' is "[a] condition that does not meet a[n energy department] regulatory requirement." *Id.* at 102. Sometimes, "noncompliances that led to the event may not be identified until the root cause analysis and preliminary inquiry have been completed." *Id.* at 126. Thus, "[a]n effective causal analysis is essential." *Id.* at 131.

Generally, "a root cause analysis [is] appropriate for more significant or complex issues." *Id.* at 129. But regardless of the issue involved, the energy department "expects a contractor conducting an investigation/causal analysis to ensure that . . . the personnel who conduct the investigation are sufficiently independent of involvement in the event and adequately trained and qualified." *Id.* "[C]ontractors should . . . investigate whether organizational and management issues contributed to the failure." *Id.* at 131. And "[a]ny identified noncompliances should be reported . . . along with associated corrective actions developed from the causal/root cause analysis." *Id.* at 126.

The Court has considered the preceding content in deciding Defendant's motion to dismiss.

**2.    The complaint states a facially plausible claim for relief.**

The NDAA protects an employee of a federal contractor who discloses information he or she "reasonably believes" evidences one of the following five types of misconduct: (1) "gross mismanagement of a Federal contract"; (2) "a gross waste of Federal funds"; (3) "an abuse of authority relating to a Federal contract"; (4) "a substantial and specific danger to public health or safety"; or (5) "a violation of law, rule, or regulation related to a Federal contract." 41 U.S.C. § 4712(a)(1).

Defendant argues Plaintiff did not make a disclosure protected by the NDAA, a relatively newer statute with scant interpretive case law. The parties agree the

Court should consult cases regarding the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302, and the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1553, 123 Stat 115, 297, for guidance in interpreting the NDAA's parallel provisions.

An employee makes a protected disclosure "if 'a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions [at issue] evidence gross mismanagement,' a gross waste of funds, an abuse of authority, or a violation of any law, rule, or regulation." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 890 (9th Cir. 2004) (first alteration in original) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)). To establish that she held the requisite reasonable belief, Plaintiff "need not prove that the condition disclosed actually established one or more of the listed categories of wrongdoing," and instead "must show that the matter disclosed was one which a reasonable person in h[er] position would believe evidenced one of the situations specified." *Drake v. Agency for Int'l Dev.*, 543 F.3d 1377, 1382 (Fed. Cir. 2008).

"Mere differences of opinion between an employee and [federal contractor] superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." *White v. Dep't of Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004). "[W]here a dispute is in the

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND DENYING DEFENDANT'S MOTION TO DISMISS **-** 14

nature of a policy dispute, 'gross mismanagement' requires that a claimed [federal contractor] error in the . . . continued adherence to . . . a policy be a matter that is not debatable among reasonable people." *Id.* at 1383.

An 'abuse of authority' is "an arbitrary and capricious exercise of authority that is inconsistent with the mission of the executive agency concerned or the successful performance of a contract . . . of such agency." 41 U.S.C. § 4712(g)(1).

"[T]here may be a reasonable belief that a [legal] violation has occurred, even though the existence of an actual violation may be debatable." *White*, 391 F.3d at 1382 n.2. However, such a belief is not reasonable unless it is based on an employee's perception of a "genuine infraction[] of law," as opposed to an "arguably minor and inadvertent miscue[] occurring in the conscientious carrying out of one's assigned duties." *Frederick v. Dep't of Justice*, 73 F.3d 349, 353 (Fed. Cir. 1996).

An employee's disclosure must "identify a 'specific law, rule, or regulation that was violated.'" *Langer v. Dep't of Treasury*, 265 F.3d 1259, 1266 (Fed. Cir. 2001) (quoting *Meuwissen v. Dep't of Interior*, 234 F.3d 9, 13 (Fed. Cir. 2000)). However, "this requirement does not necessitate the identification of a statutory or regulatory provision by title or number, when the employee's statements and the circumstances surrounding the making of those statements clearly implicate an identifiable violation of law, rule, or regulation." *Id.*

In *Coons*, an Internal Revenue Service ("IRS") employee "made disclosures regarding the manual processing of a large refund that he believed to be fraudulent for [a taxpayer] under highly irregular circumstances." 383 F.3d at 890. The Ninth Circuit concluded this was a protected disclosure, not a mere policy dispute. *Id.* The court reasoned a disinterested observer with knowledge of the essential facts would reasonably conclude this disclosure—"alleging that the IRS, whose mission is to collect taxes, improperly processed a large, fraudulent refund for a wealthy taxpayer"—raised concerns of gross mismanagement, a gross waste of funds, or an abuse of authority. *Id.*

In *Langer*, another IRS employee "mention[ed] to the [assistant U.S. attorney]s and his supervisor that he believed there was a problem with a disproportionately high number of African Americans being prosecuted." 265 F.3d at 1266. The Federal Circuit concluded this statement "clearly implicated the question of selective prosecution and sufficiently raised possible violations of civil rights to constitute a protected disclosure."

Here, Plaintiff objected to Defendant changing or manipulating the root cause finding—the official determination of how and why Defendant lost over half a million dollars to a fraudulent entity—in a report that the energy department would rely upon in determining what to do in response. Plaintiff expressed her belief that Defendant's actions were prohibited. She mentioned the internal policy, which

Plaintiff designed and implemented to comply with Defendant's contract and governing regulations. But it is not reasonable to infer her concerns were limited to the internal policy. After all, it was known even in the absence of a formal written policy that management was prohibited from changing a root cause finding. A disinterested observer with knowledge of the essential facts would reasonably conclude Defendant's actions evidenced gross mismanagement of, or an abuse of authority relating to, a federal contract, as well as a violation of regulations governing that contract. By inference, Plaintiff held the requisite reasonable belief. The NDAA therefore protects her objection.

Defendant argues the complaint is deficient and premised on an inviable legal theory because Plaintiff invokes internal policy only and does not specifically allege 'gross mismanagement,' an 'abuse of authority,' or a 'violation of law, rule, or regulation.' The Court disagrees. Such labels, even if alleged, would be legal conclusions and would not be entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678. Further, "a complaint need not pin plaintiff's claim for relief to a precise legal theory"; it must contain "only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). The Court must construe the complaint in the light most favorable to Plaintiff and draw all reasonable inferences in her favor. *See Ass'n for L.A. Deputy Sheriffs*, 648 F.3d at 991. As Enforcement Coordinator, Plaintiff

designed and implemented internal policy to comply with Defendant's contract and governing regulations. So she clearly implicated the contract and regulations when she expressed her belief that Defendant's actions violated the policy. Accepting as true all factual allegations contained in the complaint, *see Iqbal*, 556 U.S. at 678, it appears Defendant's error was not reasonably debatable because it constituted an actual violation of the policy and, by implication, the contract and regulations. Moreover, Defendant took such action despite a conflict of interests and a lack of training and expertise.

In sum, "these allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the [protected disclosure] requirement, and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (second alteration in original) (citations omitted) (quoting *Twombly*, 550 U.S. at 556; *Iqbal*, 556 U.S. at 678). The complaint states a facially plausible claim for relief.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Request for Judicial Notice, **ECF No. 10**, is **GRANTED IN PART** and **DENIED IN PART**.

2. Defendant's Motion to Dismiss for Failure to State a Claim, **ECF No. 8**, is **DENIED**.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND DENYING DEFENDANT'S MOTION TO DISMISS **-** 18

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 10th day of October 2018.

_____
SALVADOR MENDOZA, JR.
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE, AND DENYING DEFENDANT'S MOTION TO DISMISS **-** 19