FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Nov 15, 2019

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALETA BUSSELMAN, | No. 4:18-cv-05109-SMJ |
| Plaintiff, | **ORDER DENYING DEFENDANT'S SUMMARY JUDGMENT MOTION** |
| v. | |
| BATTELLE MEMORIAL INSTITUTE, an Ohio nonprofit corporation, | |
| Defendant. | |

Before the Court is Defendant Battelle Memorial Institute's summary judgment motion, ECF No. 83. Defendant seeks summary judgment in its favor on Plaintiff Aleta Busselman's claim of whistleblower retaliation under the National Defense Authorization Act ("NDAA"), 41 U.S.C. § 4712. Defendant argues (1) Plaintiff did not make a disclosure protected by the NDAA, and (2) Defendant would have taken the same personnel action in the absence of the disclosure.

The Court held a hearing on the motion on October 17, 2019. ECF No. 230. At the hearing, the Court orally denied the motion. *Id.* at 46. This Order memorializes and supplement's the Court's oral ruling. As set forth below, the Court concludes a genuine dispute of material fact exists regarding (1) whether it

was reasonable for Plaintiff to believe the information she disclosed evidenced Defendant's gross mismanagement of, or abuse of authority relating to, its contract with the U.S. Department of Energy; and (2) whether Defendant has proven its same-action defense by clear and convincing evidence.

## BACKGROUND

Defendant is an energy department contractor that manages the Pacific Northwest National Laboratory in Richland, Washington. Plaintiff is Defendant's employee at this location and has worked there for over thirty years. Plaintiff eventually became Defendant's Enforcement Coordinator. In that role, Plaintiff served as Defendant's single point of contact for enforcement coordination and reporting into the energy department's Noncompliance Tracking System, which is the system all contract laboratories use for notifying the energy department of events exceeding noncompliance risk limits. Such reports communicate a contractor's compliance assurance processes so the energy department may decide whether to exercise regulatory discretion, mitigate possible sanctions, or both. Plaintiff also interfaced and integrated Laboratory Issues Management processes with key staff in the Incidents of Security Concerns Program. Plaintiff performed this function for concerns that needed to be reported in the energy department's Safeguards and Security Information Management System.

As Enforcement Coordinator, Plaintiff had a team of eight people who

reported to her directly and were responsible for various aspects of independent oversight, assessment, and issues management. The team's focus was to investigate issues of medium or high significance. The team would work with an appropriate manager to critique an issue by documenting surrounding facts, determine the issue's root cause through specialized technical analysis, create a formal corrective action plan, and conduct a formal effectiveness evaluation to assess whether the corrective actions fixed the underlying root and contributing causes.

When Plaintiff began her job, she interviewed the employees who reported to her directly and observed their work. She found her team was reluctant to participate in controversial root cause analyses because management exerted pressure to change the results of the team's final conclusions. While management is not qualified to make substantive changes to an identified root or contributing cause, Plaintiff learned that management had previously ordered or supported such changes in varying circumstances. In 2015, the Quality and Assurance Associate Laboratory Director retired because upper management investigated and learned he had been changing the language of root cause analysis results and corrective action plans. Those conducting these analyses knew that such changes were prohibited to preserve the independent analysis of the qualified team charged with discovering the root cause of an issue. This was known even in the absence of a formal written policy preventing management from making such changes.

Plaintiff compiled and updated such an internal policy in October 2016. ECF No. 134 at 12–13. The policy reads,

> In cases where the Issue Owner does not agree with the results of the [root cause] analysis, the Laboratory Senior Cause Analyst will work with the Lead Cause Analyst, line management, the Lab-level Issue Team, and other independent technical experts as necessary, to resolve the issue(s). If the issue(s) cannot be resolved, the cause analysis team's results will remain the final documented root cause analysis, and the lack of consensus will be documented in the Issue Tracking System . . . .

ECF No. 85-4 at 10.

In December 2016, Defendant authorized payment of a $530,000 invoice submitted by a fraudulent entity posing as a subcontractor. The U.S. Department of the Treasury electronically transferred the funds to the fraudulent entity. Defendant became aware of the fraud in January 2017.

Defendant's contract with the energy department requires it to comply with various federal policies and guidelines for combating fraud. Specifically, management must develop internal policies and procedures to combat fraud and ensure they are properly implemented and effective.[1]

---

[1] By regulation, an energy department contractor "shall be responsible for maintaining, as an integral part of its organization, effective systems of management controls." 48 C.F.R. § 970.5203-1(a)(1). These controls must "reasonably ensure that . . . financial, statistical, and other reports necessary to maintain accountability and managerial control are accurate, reliable, and timely." *Id.* Further, these controls "shall be documented and satisfactory to [the energy department]." § 970.5203-1(a)(2). Also, an energy department contractor "shall be responsible for maintaining, as a part of its operational responsibilities, a baseline quality assurance

1  //

2  //

3

_____

4  program that implements documented . . . control and assessment techniques. § 970.5203-1(b). Defendant's contract contains identical provisions as the regulation quoted above. ECF No. 10-1 at 6–7, 14–15. Additionally, the contract provides Defendant "shall develop a Contractor assurance system that is . . . implemented throughout the Contractor's organization." *Id.* at 4, 12. This system, "at a minimum, shall include the following key attributes," as relevant here. *Id.* at 5, 12. First, this system must include "[a] comprehensive description of the assurance system with processes, key activities, and accountabilities clearly identified." *Id.* Second, this system must include "[r]igorous, risk-based, credible self-assessments, . . . including . . . independent reviews." *Id.* Finally, this system must include "[i]dentification and correction of negative . . . compliance trends." *Id.*

According to an energy department handbook, an Enforcement Coordinator's responsibilities include "[e]nsuring that contractor managers have a working knowledge of [the energy department]'s enforcement program," "[m]onitoring contractor compliance assurance program effectiveness and progress in moving toward a culture of critical self-evaluation and continuous improvement," "[m]anaging or overseeing screening of problems, issues, findings, and conditions to identify noncompliances," and, critically "[e]nsuring proper and timely reporting of noncompliances." *Id.* at 106.

'Noncompliance' is "[a] condition that does not meet a[n energy department] regulatory requirement." *Id.* at 102. Sometimes, "noncompliances that led to the event may not be identified until the root cause analysis and preliminary inquiry have been completed." *Id.* at 126. Thus, "[a]n effective causal analysis is essential." *Id.* at 131.

Generally, "a root cause analysis [is] appropriate for more significant or complex issues." *Id.* at 129. But regardless of the issue involved, the energy department "expects a contractor conducting an investigation/causal analysis to ensure that . . . the personnel who conduct the investigation are sufficiently independent of involvement in the event and adequately trained and qualified." *Id.* "[C]ontractors should . . . investigate whether organizational and management issues contributed to the failure." *Id.* at 131. And "[a]ny identified noncompliances should be reported . . . along with associated corrective actions developed from the causal/root cause analysis." *Id.* at 126.

ORDER DENYING DEFENDANT'S SUMMARY JUDGMENT MOTION - 5

Defendant requested Plaintiff's assistance to determine the root cause of its $530,000 payment to a fraudulent entity. Under Plaintiff's supervision, a cause analysis team was assembled. The issue was determined to be of medium significance, requiring a level 2 root cause analysis. The scope of the cause analysis was limited to Defendant's response to the fraudulent entity's prompt. Other governmental agencies launched investigations into how the fraudulent entity obtained the information necessary to accomplish this deception.

After reviewing over twenty-five documents and interviewing nineteen witnesses, Plaintiff's team determined the root cause of Defendant's $530,000 payment to a fraudulent entity was management's failure to clearly define adequate controls. Specifically, in March 2017, Plaintiff's team found

> Business Systems Directorate . . . management did not clearly define adequate controls regarding the identification, detection and response to potential fraudulent activities by external criminal entities in the Vendor Management Process; primarily relying on individual staff members to identify and respond to potential external threats.

ECF No. 134 at 22.

Plaintiff learned management was dissatisfied with her team's root cause finding and sought to change it. Plaintiff opposed any change to the language above. Around March 29, 2017, Defendant's Chief Financial Officer and Associate Laboratory Director for Business Systems became concerned over the root cause finding and began to exert pressure to change it because he felt it made management

look bad. He told Plaintiff that the way the root cause finding was written did not put the laboratory in a good light and made it look as if it were asleep at the wheel. In the ensuing days, Plaintiff attended several meetings and exchanged numerous emails with management seeking to protect her team from pressure to change the root cause finding.

On March 31, 2017, Plaintiff wrote to Defendant's Associate Laboratory Director, stating,

> Per our [How Do I?] requirements and cause analyst qualification process, this is not how we do cause analysis at our Lab. We do not just let concerned stakeholders manipulate root causes at the end of the process to make us sound better. [The laboratory's attorney] looked at this report twice before it came to [management]. [Management] has yet to bring the team together to discuss how they got to the end results.

> That (changing root causes and results at the 11th hour) was the [prior Quality and Assurance Associate Laboratory Director's ]way. Not doing it and I am not going to have this cause analysis team think that we have returned to the "old" way of doing business. Otherwise, why bother. . . . I am not going to make this team sign a product they can't stand behind.

ECF No. 85-17 at 2.

Plaintiff's efforts were ultimately unsuccessful. Defendant's final April 2017 Cause Analysis Report changed the language as follows:

> Business Systems Directorate management had a primary focus on controls over internal fraud risks in response to [the energy department]'s annual risk statements in the Accounts Payable area (which did not specifically address external fraud risks) and based on the majority of previous experience involving internal fraud. Consequently, the controls for the identification, detection and

response to evolving fraudulent activities by external criminal entities in the Vendor Management Process were less than adequate.

ECF No. 85-27 at 3; ECF No. 137-31 at 4–5.

Plaintiff believed management's actions in changing the root cause finding violated internal policy. Plaintiff knew management lacked training and expertise to make these changes. Further, Plaintiff believed it was a conflict of interests for management to makes these changes because the root cause finding blamed management's failure to clearly define adequate controls.

Plaintiff went on vacation the day after she sent the above email. The day after she returned, on April 11, 2017, Defendant reassigned Plaintiff to a different position.

On July, 2, 2018, Plaintiff filed the present action for whistleblower retaliation under the NDAA. ECF No. 1. Defendant argues (1) Plaintiff did not make a disclosure protected by the NDAA, and (2) Defendant would have taken the same personnel action in the absence of the disclosure.

## LEGAL STANDARD

The Court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of showing no genuine dispute of material fact exists because a reasonable jury could not find in favor of the nonmoving party. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 n.10, 587 (1986). If the moving party makes this showing, the nonmoving party then bears the burden of showing a genuine dispute of material fact exists because reasonable minds could differ on the result. *See Anderson*, 477 U.S. at 248–51; *Matsushita Elec. Indus.*, 475 U.S. at 586–87.

The nonmoving party may not rest upon the mere allegations or denials of its pleadings but must instead set forth specific facts, and point to substantial probative evidence, tending to support its case and showing a genuine issue requires trial. *See Anderson*, 477 U.S. at 248–49. The Court must enter summary judgment against the nonmoving party if it fails to make a showing sufficient to establish an element essential to its case and on which it would bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 322.

In ruling on a summary judgment motion, the Court must view the evidence in the light most favorable to the nonmoving party. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Thus, the Court must accept the nonmoving party's evidence as true and draw all

reasonable inferences in its favor. *See Anderson*, 477 U.S. at 255. The Court may not assess credibility or weigh evidence. *See id.*

## DISCUSSION

**A.     A genuine dispute of material fact exists regarding whether it was reasonable for Plaintiff to believe the information she disclosed evidenced Defendant's gross mismanagement, abuse of authority, or violation of rules or regulations.**

Defendant argues Plaintiff did not make a disclosure protected by the NDAA. The Court already rejected Defendant's argument at the pleading stage, concluding that Plaintiff stated a facially plausible claim for relief. Now, Defendant tests whether Plaintiff's claim survives scrutiny at the summary judgment stage. It does.

The NDAA protects an employee of a federal contractor who discloses information he or she "reasonably believes" evidences one of the following five types of misconduct: (1) "gross mismanagement of a Federal contract"; (2) "a gross waste of Federal funds"; (3) "an abuse of authority relating to a Federal contract"; (4) "a substantial and specific danger to public health or safety"; or (5) "a violation of law, rule, or regulation related to a Federal contract." 41 U.S.C. § 4712(a)(1).

The NDAA is a relatively newer statute with scant interpretive case law. The Court therefore consults cases regarding the Whistleblower Protection Act of 1989, 5 U.S.C. § 2302, and the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, § 1553, 123 Stat 115, 297, for guidance in interpreting the NDAA's parallel provisions. *See* ECF No. 20 at 14.

An employee makes a protected disclosure "if 'a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions [at issue] evidence gross mismanagement,' a gross waste of funds, an abuse of authority, or a violation of any law, rule, or regulation." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 890 (9th Cir. 2004) (first alteration in original) (quoting *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)). To establish that she held the requisite reasonable belief, Plaintiff "need not prove that the condition disclosed actually established one or more of the listed categories of wrongdoing," but instead "must show that the matter disclosed was one which a reasonable person in h[er] position *would believe* evidenced one of the situations specified." *Drake v. Agency for Int'l Dev.*, 543 F.3d 1377, 1382 (Fed. Cir. 2008) (emphasis added).

"Mere differences of opinion between an employee and [federal contractor] superiors as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." *White v. Dep't of Air Force*, 391 F.3d 1377, 1381 (Fed. Cir. 2004). "[W]here a dispute is in the nature of a policy dispute, 'gross mismanagement' requires that a claimed [federal contractor] error in the . . . continued adherence to . . . a policy be a matter that is not debatable among reasonable people." *Id.* at 1383.

An 'abuse of authority' is "an arbitrary and capricious exercise of authority

that is inconsistent with the mission of the executive agency concerned or the successful performance of a contract . . . of such agency." 41 U.S.C. § 4712(g)(1).

"[T]here may be a reasonable belief that a [legal] violation has occurred, even though the existence of an actual violation may be debatable." *White*, 391 F.3d at 1382 n.2. However, such a belief is not reasonable unless it is based on an employee's perception of a "genuine infraction[] of law," as opposed to an "arguably minor and inadvertent miscue[] occurring in the conscientious carrying out of one's assigned duties." *Frederick v. Dep't of Justice*, 73 F.3d 349, 353 (Fed. Cir. 1996).

An employee's disclosure must "identify a 'specific law, rule, or regulation that was violated.'" *Langer v. Dep't of Treasury*, 265 F.3d 1259, 1266 (Fed. Cir. 2001) (quoting *Meuwissen v. Dep't of Interior*, 234 F.3d 9, 13 (Fed. Cir. 2000)). However, "this requirement does not necessitate the identification of a statutory or regulatory provision by title or number, when the employee's statements and the circumstances surrounding the making of those statements clearly implicate an identifiable violation of law, rule, or regulation." *Id.*

In *Coons*, an Internal Revenue Service ("IRS") employee "made disclosures regarding the manual processing of a large refund that he believed to be fraudulent for [a taxpayer] under highly irregular circumstances." 383 F.3d at 890. The Ninth Circuit concluded this was a protected disclosure, not a mere policy dispute. *Id.* The

court reasoned a disinterested observer with knowledge of the essential facts would reasonably conclude this disclosure—"alleging that the IRS, whose mission is to collect taxes, improperly processed a large, fraudulent refund for a wealthy taxpayer"—raised concerns of gross mismanagement, a gross waste of funds, or an abuse of authority. *Id.*

In *Langer*, another IRS employee "mention[ed] to the [assistant U.S. attorney]s and his supervisor that he believed there was a problem with a disproportionately high number of African Americans being prosecuted." 265 F.3d at 1266. The Federal Circuit concluded this statement "clearly implicated the question of selective prosecution and sufficiently raised possible violations of civil rights to constitute a protected disclosure." *Id.*

Here, Plaintiff objected to Defendant changing or manipulating the root cause finding—the official determination of how and why Defendant lost over half a million dollars to a fraudulent entity—in a report that the energy department would rely upon in determining what to do in response. Plaintiff expressed her belief that Defendant's actions were prohibited.

For support, Plaintiff mentioned the internal policy that she compiled and updated. *See* ECF No. 134 at 11. The internal policy was "a means to directly express to management established policies, procedures, regulations and contract terms that guide the Integrated Issue Management implementation requirements

(including cause analysis activities), which prohibits management manipulation of cause analysis results" *Id.* at 12. Viewing the evidence in the light most favorable to Plaintiff, the internal policy was designed to comply with Defendant's contract and governing regulations.

Thus, it is not reasonable to infer Plaintiff's concerns were limited to the internal policy. After all, it was known even in the absence of a formal written policy that management was prohibited from changing a root cause finding. A disinterested observer with knowledge of the essential facts could reasonably conclude Defendant's actions evidenced gross mismanagement of, or an abuse of authority relating to, a federal contract, as well as a violation of regulations governing that contract. By inference, Plaintiff held the requisite reasonable belief. The NDAA therefore protects her objection.

Defendant argues Plaintiff invoked internal policy only and did not specifically complain of 'gross mismanagement,' an 'abuse of authority,' or a 'violation of law, rule, or regulation.' However, she was not required to use magic words. Nor was she required to object in sufficient detail to trigger constructive notice. The issue is whether she disclosed information she *reasonably believed* evidenced prohibited misconduct.

As Enforcement Coordinator, Plaintiff compiled and updated the internal policy that was designed to comply with Defendant's contract and governing

regulations. So she clearly implicated the contract and regulations when she expressed her belief that Defendant's actions violated the policy. Viewing the evidence in the light most favorable to Plaintiff, it appears Defendant's error was not reasonably debatable because it could have amounted to an actual violation of the policy and, by implication, the contract and regulations. Moreover, Defendant took such action despite a conflict of interests and a lack of training and expertise.

Plaintiff's disclosure strenuously objected that Defendant's actions presented a conflict of interests. She unequivocally declared, "we do not just let concerned stakeholders manipulate root causes at the end of the process to make us sound better." ECF No. 85-17 at 2. She warned that allowing such individuals to "chang[e] root causes and results at the 11th hour" represented an improper "return[] to the 'old' way of doing business." *Id.* And it was common knowledge that this old way of doing business led the prior director to retire two years earlier amidst controversy over similar behavior.

In sum, a genuine dispute of material fact exists regarding whether it was reasonable for Plaintiff to believe the information she disclosed evidenced Defendant's gross mismanagement, abuse of authority, or violation of rules or regulations. As such, Defendant is not entitled to judgment as a matter of law.

//

//

**B.** **A genuine dispute of material fact exists regarding whether Defendant would have taken the same personnel action in the absence of Plaintiff's disclosure.**

The NDAA incorporates a statutory burden-shifting framework where it provides, "[t]he legal burdens of proof specified in section 1221(e) of title 5 shall be controlling for the purposes of any . . . judicial . . . proceeding to determine whether discrimination prohibited under this section has occurred." 41 U.S.C. § 4712(c)(6). Under this framework, an employee must first "demonstrate[] that a disclosure . . . was a contributing factor in the personnel action which was taken . . . against such employee." 5 U.S.C. § 1221(e)(1). An employee may make this showing "through circumstantial evidence," including evidence that "the official taking the personnel action knew of the disclosure" or "the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure . . . was a contributing factor in the personnel action." *Id.* § 1221(e)(1)(A)–(B). If an employee makes this showing, the employer must then "demonstrate[] by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 1221(e)(2).

"Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(e). Three factors determine whether an employer has made this showing: "(1) 'the strength of the [employer]'s evidence in support

of' the action taken; (2) 'the existence and strength of any motive to retaliate on the part of' the decision-makers; and (3) 'any evidence that the [employer] takes similar actions against' similarly situated employees who are not whistleblowers." *Duggan v. Dep't of Def.*, 883 F.3d 842, 846 (9th Cir.) (quoting *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999)), *cert. denied*, 139 S. Ct. 341 (2018).

Plaintiff asks the Court to apply alternative factors. ECF No. 133 at 27–28 (quoting *Speegle v. Stone & Webster Constr., Inc.*, No. 13-074, 2014 WL 1758321 (U.S. Dep't of Labor Admin. Rev. Bd. Apr. 25, 2014), *available at* ECF No. 133-2). Specifically, Plaintiff requests the Court apply the U.S. Department of Labor Administrative Review Board's *Speegle* factors instead of, or in addition to, the Federal Circuit's *Carr* factors. But the Ninth Circuit has adopted the *Carr* factors, not the *Speegle* factors. *See Duggan*, 883 F.3d at 846. The two sets are similar but still analytically different. *See Smith v. Dep't of Labor*, 674 F. App'x 309, 314, 317 (4th Cir. 2017). Though *Carr* was decided before *Speegle*, the latter does not discuss the former. *Compare Carr*, 185 F.3d 1318, *with Speegle*, 2014 WL 1758321. And in embracing the former, the Ninth Circuit has never even acknowledged the latter.[2]

---

[2] The Ninth Circuit has routinely applied *Carr* without ever referencing *Speegle*. *See Alguard v. U.S. Dep't of Agric.*, 755 F. App'x 699, 700 (9th Cir. 2019); *Flynn v. Merit Sys. Prot. Bd.*, 747 F. App'x 609, 610 (9th Cir. 2019); *Lucchetti v. U.S. Dep't of the Interior*, 754 F. App'x 542, 543–45 (9th Cir. 2018); *Duggan*, 883 F.3d at 846–47; *Layton v. U.S. Air Force*, 707 F. App'x 429, 430–31 (9th Cir. 2017). While, in one case, the parties cited *Speegle* to the Ninth Circuit extensively, *see* Brief of Defendant-Appellant BNSF Railway Company at 20–30, *Elliott v. BNSF*

The Court will not apply factors alternative to those that the Ninth Circuit adopted.

Plaintiff's declaration substantiates her allegation that she suffered adverse employment action by being relieved of her management responsibilities, being placed under the supervision of Cindy Doyle (a colleague with whom she did not get along), and having her other responsibilities assigned to Doyle. *See* ECF No. 134 at 27–29; *see also* ECF No. 1 at 21. Additionally, Plaintiff's declaration substantiates her allegation that she was reassigned to an illegitimate "special assignment" and informed she needed to find work within the laboratory by the beginning of the new fiscal year or would be terminated. *See* ECF No. 134 at 32–33, 35–36; *see also* ECF No. 1 at 22–23.

Regarding her reassignment, Plaintiff elaborates that "[t]here was no negotiation or opportunity for [her] to voice any concerns" because the director, Dr. John LaFemina, "had already made the decision and that was that." ECF No. 134 at 29. Plaintiff says that, at the time Dr. LaFemina reassigned her, "[t]here were no performance or budget concerns referenced . . . or any indication that these factors played any role whatsoever in the decision to move [her] out of [her] job." *Id.*

Plaintiff's reassignment took effect three days after Dr. LaFemina announced

---

*Ry. Co.*, 714 F. App'x 737 (9th Cir. 2018) (No. 15-35785), 2016 WL 832888, at *20–30; Brief of Appellee at 21–25, *Elliott*, 714 F. App'x 737 (No. 15-35785), 2016 WL 1715099, at *21–25, there, the appellate panel did not even mention *Speegle*, instead concluding summarily that the record did not show the district court applied the wrong legal standard, *see Elliott*, 714 F. App'x at 738.

it. *Id.* at 30. Plaintiff did not want Dr. LaFemina to remove any of her duties. *Id.* Instead, she wanted his support to either let her do her assigned job or give her Doyle's Contractor Assurance System Management and Operations Program Manager ("M&O") duties so Plaintiff could apply more project execution activities to that role. *Id.*

Still, it is undisputed that Plaintiff asked Dr. LaFemina to "reorganize the division of duties" because she and Doyle "were in major conflict all the time." ECF No. 84 at 27. Indeed, Plaintiff admits that, when Dr. LaFemina asked her "how to make the organization better," she responded she could swap some job duties with Doyle—"[Plaintiff] would take M&O because [Doyle] was struggling with it, and [Plaintiff] would have more work after the swap." ECF No. 134 at 32. Plaintiff said that "if Doyle doesn't transfer to [her] the appropriate knowledge and required duties to the scope that [Dr.] LaFemina has assigned me - [Plaintiff] will not be successful." *Id.* "Plaintiff admits she suggested to Dr. LaFemina that her management responsibilities over [the laboratory]'s [Core Business Processes] program 'might make more sense under [Doyle].'" ECF No. 84 at 28. "Plaintiff's 'journal' entry also states 'I also mentioned that Independent Oversight [led by Nancy Sargent] . . . might be a better fit under Cindy from a line perspective because Nancy and Cindy are friends and are often colluding without me on strategic assessments.'" *Id.* (alteration and omission in original).

Dr. LaFemina did not want to transfer duties in the way Plaintiff suggested "because he 'was not about to give [Plaintiff] more responsibility when she was telling [him] that she wanted to give up her responsibilities.'" *Id.* at 29 (first alteration in original). "Plaintiff and Dr. LaFemina discussed other assignments that Plaintiff might be interested in pursuing, including 'business capture' functions." *Id.*

Plaintiff has shown that her disclosure was a contributing factor in Dr. LaFemina's decision to reassign her because he knew of the disclosure and the reassignment occurred shortly after. Thus, Defendant must show by clear and convincing evidence that it would have taken the same personnel action in the absence of Plaintiff's disclosure.

The first factor is the strength of Defendant's evidence in support of the personnel action taken. This factor does not clearly and convincingly weigh in Defendant's favor. While Dr. LaFemina reassigned Plaintiff following her discussion of that possibility, he did not do what she asked. And what he reassigned her to was hasty, having no job description and turning out to be illegitimate. Plaintiff then faced risk of termination if she did not find work within the laboratory by the beginning of the new fiscal year.

The second factor is the existence and strength of any motive Dr. LaFemina may have had to retaliate against Plaintiff. This factor does not clearly and

convincingly weigh in Defendant's favor. Plaintiff's disclosure could be seen as threatening to Dr. LaFemina because it indirectly accused him of returning to the ways of the prior director, who retired amidst controversy over changing the language of root cause analysis results and corrective action plans. It is true that Plaintiff apparently had a very good working relationship with Dr. LaFemina before her reassignment. And it is also true that Dr. LaFemina initially asked Plaintiff to remain in charge of the laboratory's issues management program and cause analysis process. Nevertheless, his decision to reassign her, and the way he went about that reassignment, could have been motivated by a desire to delegitimize her because he saw her as a threat to his authority over the laboratory. At oral argument, Plaintiff clarified that removing her responsibilities and making her subordinate to Doyle was an effective means of "undercutting her in the workplace" and "sabotaging her and not allowing her to get her job done." ECF No. 230 at 26–27.

The third factor is any evidence that Defendant takes similar personnel action against similarly situated employees who are not whistleblowers. No such evidence exists. Therefore, this factor has no bearing in the Court's analysis. Contrary to Plaintiff's argument, Doyle was not similarly situated to her because Doyle did not request reassignment whereas Plaintiff did.

Considering all, a genuine dispute of material fact exists regarding whether Defendant would have taken the same personnel action in the absence of Plaintiff's

disclosure. As such, Defendant is not entitled to judgment as a matter of law.

## C.    Defendant's challenges to Plaintiff's submissions

Defendant has lodged hundreds of objections to, and requests to strike, Plaintiff's submissions. *See* ECF No. 158 at 2–113, 116, 120, 122–23, 125, 127, 131, 137, 141–42, 144–46, 148–49, 151, 153–54, 156–59, 161–64, 168, 170–72, 175, 179, 181–82, 185, 187, 192, 194, 197, 200, 205–06, 208, 211, 213, 216–17, 220–22, 225, 227, 229–31, 233, 237–39, 241–45, 248, 250–51, 254, 257, 261–62, 266–73, 275–77, 279–80, 283, 285–86, 288–92, 296–97, 317, 326, 330, 331, 333, 335, 337, 338, 343. The Court overrules and denies all of these challenges because it appears that Plaintiff's evidence could be presented in *some* admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *Celotex*, 477 U.S. at 324; *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 925–26 (9th Cir. 2014); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). However, the Court grants Defendant's request to strike Plaintiff's improper *praecipe* filed after all briefing was complete. *See Dutta v. State Farm Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1172 (9th Cir. 2018); *see also* ECF No. 182 (challenging ECF No. 180-1).

Accordingly, **IT IS HEREBY ORDERED**:

1.    Defendant's summary judgment motion, **ECF No. 83**, is **DENIED**.

2.    Defendant's request to strike, **ECF No. 182**, is **GRANTED** and the improper filing at issue, **ECF No. 180-1**, is **STRICKEN**.

3.     Plaintiff's objections, **ECF No. 135 at 25, 34, 53, 113, 132, 134, 136, 139, 150; ECF No. 139-1 at 25, 34, 53, 113, 132, 134, 136, 139, 150**, are **DENIED AS MOOT**.

**IT IS SO ORDERED.** The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 15th day of November 2019.

SALVADOR MENDOZA, JR.
United States District Judge